

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-23-00100-CV

**GULF VIEW PRIVATE INVESTMENT, INC.** f/k/a Whitesell International, Inc., Neil Whitesell, Vincent Costantino, Adam Arters, Innova Aerospace Service & Support, LLC and Sierra Industries, LLC,
Appellants

v.

**GC SYSTEM, A.S.**,
Appellee

From the 408th Judicial District Court, Bexar County, Texas
Trial Court No. 2018-CI-03330
Honorable Angelica Jimenez, Judge Presiding

Opinion by:     Rebeca C. Martinez, Chief Justice

Sitting:         Rebeca C. Martinez, Chief Justice
                 Irene Rios, Justice[1]
                 Lori I. Valenzuela, Justice

Delivered and Filed: October 16, 2024

AFFIRMED IN PART; AFFIRMED AS MODIFIED IN PART; REVERSED AND RENDERED IN PART; AND REMANDED

Appellants/cross-appellees Gulf View Private Investment Inc. ("Gulf View"), Neil Whitesell, Vincent Costantino, and Adam Arters (collectively "the Whitesell Appellants"), Innova Aerospace Service & Support, LLC ("Innova"), and Sierra Industries, LLC ("Sierra") appeal from a judgment, rendered in large part in accordance with a jury verdict, that awards appellee/cross-

---

[1] Justice Irene Rios concurs in judgment only.

appellant GC System, A.S. $4,035,511 in actual damages and $1,833,267 in attorneys' fees. In five issues, all appellants contend that: (1) the evidence is legally and factually insufficient to support the jury's finding of liability and/or corresponding damages for GC System's claims of (a) breach of contract; (b) violations of the Texas Theft Liability Act ("TTLA"); (c) negligence; (d) fraud; (e) violations of the Texas Uniform Fraudulent Transfer Act ("TUFTA"); and (f) negligent misrepresentation; (2) the trial court violated the one-satisfaction and economic loss rules in rendering judgment on the jury's verdict because the judgment awards duplicative damages for the same contractual violations and tort injuries; (3) the trial court abused its discretion by overruling appellants' objection to the testimony of Radek Kindl, a GC System executive, on the ground that he lacked personal knowledge; (4) the trial court erred in awarding attorneys' fees; and (5) inconsistencies in five aspects of the judgment necessitate reformation.

In the Whitesell Appellants' sole discrete issue, they contend that the evidence is legally insufficient to pierce the corporate veils of Innova and Sierra.

In three cross-issues, GC System argues that the trial court: (1) erred in sustaining appellants' motions for judgment notwithstanding the verdict (j.n.o.v.) and disregarding the jury's award of some of the mitigation damages; (2) abused its discretion in awarding it less than all of the attorneys' fees that it sought; and (3) erred in determining the appropriate post-judgment interest.

We affirm in part, affirm as modified in part, reverse and render in part, and remand.

# I. BACKGROUND[2]

## A.    Factual Background

In May 2016, GC System, a company headquartered in the Czech Republic, purchased a 1979 Cessna Citation (the "Aircraft") from Petr Mara for $500,000.  After purchasing the Aircraft, GC System sought a company to perform modifications to it.  Later in May 2016, Mara, acting on behalf of GC System, and James Coggeshall, a regional sales representative with Sierra executed five proposals for modifications relating to: (1) an XR extended fuel tank; (2) an Eagle wing modification; (3) wi-fi; (4) SkyStep cabin steps; and (5) replacement of the original avionics.  GC System paid Sierra $1,036,428.51 as an advance, and it delivered the Aircraft to Sierra's facility in Uvalde, Texas on July 10, 2016.  At the time, Sierra estimated that the work would be completed by January 2017.

A year before GC System's purchase of the Aircraft, Whitesell, an investor, began negotiating with Mark Huffstutler, an aviation entrepreneur.  Huffstutler owned various aviation entities, including Sierra and Lancair.  Sierra performed modification services, some maintenance, repair, and overhaul ("MRO") services, and some Supplemental Type Certificate ("STC") development.  STCs are essentially patents issued by the Federal Aviation Administration ("FAA") for customized aircraft parts, and as such, they have the potential to be a lucrative asset.  Whitesell, through a wholly-owned entity known as Innovative Capital Holdings, Inc. ("ICH"), and Huffstutler, through a wholly-owned entity known as SkyWay Group, Inc., formed SkyWay Aviation Group, Inc. ("SWAG") with each wholly-owned entity taking a fifty-percent ownership interest.  As part of the agreement, Huffstutler placed Sierra in SWAG.

---

[2] In light of the extensive review of the evidence necessary to analyze appellants' challenges to the sufficiency of the evidence, our recitation of the background provides merely a brief orientation.

The parties vehemently dispute Whitesell's motivation and business decisions regarding his interest in Sierra. According to GC System, Whitesell "disdained the MRO business line," placed "moles" within Sierra, redirected Sierra's resources to STC development, and simultaneously starved SWAG — and by extension Sierra — of necessary capital but infused it with "loans"[3] that functionally reduced Huffstutler's ownership interest. According to appellants, Sierra was an underperforming entity at the time of acquisition. Costantino, Gulf View's chief financial officer, and Arters, Gulf View's director of finance, provided management services to Whitesell's various entities, including SWAG in the hopes of boosting Sierra's performance.

Meanwhile, Sierra transferred the Aircraft from its facility in Uvalde, Texas to its facility at the San Antonio International Airport. Sierra had also fallen behind on the five modifications. It blamed the Aircraft's age and the presence of "squawks" — an aviation industry term for defects that need to be repaired — that were discovered during the modification process. GC System blamed the Whitesell Appellants' stranglehold on Sierra's finances for the benefit of STC development. In March 2017, representatives from both parties met at Sierra's San Antonio facility, and they executed a memorandum of understanding wherein the scope of the work was curtailed and the estimated completion date was pushed back to mid-July 2017.

By July 2017, the amended modification work on the Aircraft had not been completed. Additionally, Innova, through an asset transfer agreement, assumed all of Sierra's contractual obligations, including the amended modification work on the Aircraft.

In November 2017, ICH, at Whitesell's direction, stopped loaning SWAG money, and consequently, Innova shuttered. GC System demanded that Innova transfer the Aircraft to Lancair so that it could complete the modification work. Innova representatives suggested that GC System

---

[3] Since SWAG's formation, ICH had loaned it $13 million.

execute a mutual release of liability. GC System characterized Innova's suggestion as "ransom," and it refused to execute it. Instead, GC System sought and obtained an order from a state district court for return of the Aircraft.

In December 2017, the Aircraft was transferred to Lancair for completion. In December 2020, Lancair delivered the Aircraft to a European aviation company for additional work. The European aviation company returned the Aircraft to GC System on April 13, 2021.

**B.      Procedural Background**

In February 2018, GC System sued appellants on several claims, including breach of contract.

On August 30, 2018, the trial court signed an "agreed" order granting GC System's motion for partial summary judgment. The order found that Sierra and Innova breached three proposals. It expressly disclaimed any ruling on damages, attorneys' fees, or any of GC System's other claims.

In April 2022, GC System's request for contractual damages, request to pierce Sierra's and Innova's corporate veils and hold the Whitesell Appellants liable, and claims for violations of TTLA and TUFTA, negligence, fraud, and negligent misrepresentation were tried to a jury over the course of a month. In a 10-2 verdict, the jury substantially found in GC System's favor. Notably, the jury awarded GC System both out-of-pocket and mitigation damages on its breach of contract claim.

After the verdict and in accordance with an agreement by the parties, the parties tried GC System's request for attorneys' fees to the bench. Additionally, appellants moved that GC System elect between an award of out-of-pocket and mitigation damages. The trial court signed a final judgment that comports with the jury's verdict, except that it awards GC System no mitigation

damages. All parties filed post-judgment motions, which were overruled by operation of law, and all parties filed timely notices of appeal.

## II. SUFFICIENCY OF THE EVIDENCE

In appellants' first issue, they contend that the evidence is legally and factually insufficient to support the jury's finding of liability and/or corresponding damages for all of GC System's claims.

### A.    Standards of Review

In a legal-sufficiency challenge, we consider whether the evidence at trial would enable a reasonable and fair-minded factfinder to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We "must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id*. We will only reverse the judgment if: (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *Id*. at 810. We view evidence in the light most favorable to the ruling on a legal sufficiency challenge, indulging every reasonable inference in the trial court's favor. *Id*. at 822. The record contains more than a mere scintilla of evidence if reasonable minds could form differing conclusions about a vital fact's existence. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). Conversely, the record is insufficient when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence. *Id*.; *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

In a factual-sufficiency challenge, we consider and weigh all the evidence, and can set aside a verdict only if the evidence is so weak or the finding is so against the great weight and

preponderance of the evidence that it is clearly wrong and manifestly unjust. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761–62 (Tex. 2003).

GC System contends that appellants' factual sufficiency challenges are conclusory and therefore waived. Specifically, GC System argues that "[o]ften by just a conclusory statement, [a]ppellants appear to complain of the factual sufficiency of almost every [j]ury finding. But the substance of their arguments is almost entirely 'no evidence' — legal insufficiency." Appellants' reply brief argues that in *Lion Copolymer Holdings, LLC v. Lion Polymers, LLC*, 614 S.W.3d 729, 732 (Tex. 2020) (per curiam), the Texas Supreme Court "approved the appellant's 'intertwined' analysis of its legal and factual sufficiency complaints." Appellants further argue that "[a]s to countervailing evidence, there was none to discuss, because as Sierra/Innova repeatedly pointed out, the record contains no evidence to support the jury's findings." In *Lion Copolymer*, the Texas Supreme Court observed that an appellant had adequately briefed a factual sufficiency challenge where the appellant, *inter alia*, "listed the evidence that [the appellee] relied on to support its claim" against the appellant, and "subsequently *weighed* each of these pieces of evidence against *countervailing* evidence." *Id*. at 733 (emphasis added).

Appellants' arguments that "the record contains no evidence to support the jury's findings" are properly categorized as legal — not factual — sufficiency challenges, *see City of Keller*, 168 S.W.3d at 827, and we will faithfully apply the legal sufficiency standard of review to those arguments. Rather than categorically hold that appellants inadequately briefed all factual sufficiency challenges, we will, in accordance with *Lion Copolymer*, weigh *supporting* and *countervailing* evidence in those instances where appellants' briefing directs us to such.

**B.** **Claims**

Before turning to appellants' sufficiency challenges, we provide a brief outline in chart form of the jury's verdict, the parties' limited stipulation of certain potential damages, the judgment, and the mitigation damages that GC System seeks by its cross-appeal:

| Claim | Verdict | Stipulation | Judgment | GG System's Cross Appeal |
|---|---|---|---|---|
| Breach of Contract - Out of Pocket Damages | $1,036,428 | | $1,036,426[4] | |
| Breach of Contract - Mitigation Damages | $6,603,318 | | $0 | $289,782.44[5] |
| TTLA | $1,053,728 | | $1,053,728 | |
| SkyStep Cabin Steps | $14,000 | | $14,000 | |
| Original Avionics | $305,557 | | $305,557 | |
| Removed Parts | $150,000[6] | | $150,000 | $51,064.67 |
| Aircraft | $584,171 | | $584,171 | |
| Negligence | | | $850,000 | |
| Lost Items | $200,000 | | $200,000 | |
| Hail Damage | | $186,000 | $186,000 | |
| Engine Damage | | $464,000 | $464,000 | |
| Negligent Misrepresentation | $345,387 | | $345,387 | |
| Fraud | $750,000[7] | | $750,000 | $523,000 |
| TUFTA | | | Injunction | |

### 1. Out-of-Pocket Damages for Breach of Contract

In accordance with the order granting GC System's motion for partial summary judgment on its breach of contract claim, appellants did not in the trial court — and do not on appeal — contest that they are liable on GC System's breach of contract claim. Nevertheless, appellants

---

[4] All parties agree that the final judgment contains a scrivener's error regarding the award of out-of-pocket damages. We correct this error in our appellate judgment.

[5] Although the jury answered $6,603,318, GC System agreed, before the trial court signed the judgment, to a $5,000,000 remittitur. However, the trial court signed a judgment that awarded no mitigation damages. On appeal, GC System agrees to a greater remittitur, and seeks $289,782.44 in mitigation damages by its cross appeal.

[6] GC System states it will accept a remittitur of $98,935.44 for the removed parts.

[7] GC System states it will accept a remittitur of $227,000 on the award for its fraud claim.

argue that the evidence is legally and factually insufficient to support the jury's award of

$1,036,428 for out-of-pocket damages as that specific element is defined in the jury charge.

The jury charge instructed:

The Court holds and instructs the jury that Sierra and Innova breached the May 24, 2016 Agreement and the March 24, 2017 Memorandum of Understanding ("MOU") when Sierra and Innova:

a.      Failed to deliver the completed aircraft on September 21, 2016; and

b.      Failed to finally complete the agreed *repair and service* of the Aircraft.

The Court also holds and instructs the jury that:

a.      On or about May 24, 2016, [GC System] entered into an Agreement with Defendant SIERRA INDUSTRIES, LLC for the *repair and service* of [the Aircraft] consisting of certain agreed proposals. Sierra breached its agreements with regard to the following proposals:

        Accepted proposal No. SIA V-0516-P03 [avionics modification];
        Accepted proposal No. SIMOD-0516-Pol [Eagle wing modification];
        Accepted proposal No. SIAV-0516-Pl0 [WiFi modification].

b.      GC System paid Sierra in full in connection with these proposals and agreements.

c.      Sierra failed to deliver the completed aircraft on September 21, 2016 as agreed.

d.      Innova is Sierra's successor in interest to the May 24, 2016 agreements with Sierra.

e.      Neither Innova [n]or Sierra ever completed the agreed *repair and service* of [the Aircraft] at any time.

The Court holds and instructs the jury that:

a.      On or about May 24, 2016, GC System entered into an Agreement with Sierra for the *repair and service* of [the Aircraft] consisting of certain agreed proposals.

b.      Sierra breached its agreement with regard to Accepted Proposal No. SIMOD-0516-P02 ("Fuel Tank Mod Proposal").

c. GC System paid Sierra in full in connection with the Fuel Tank Mod Proposal.

d. Innova is Sierra's successor in interest with regard to the Fuel Tank Mod Proposal.

e. The Fuel Tank Mod Proposal was withdrawn by agreement. Thereafter Innova and [GC System] agreed that Innova would provide [GC System] with a refund of $275,000 USD at the completion of the project, less a credit for any additional work performed beyond the original May 24, 2016 agreements.

f. Innova never provided any refund of the $275,000.

g. GC System and Innova entered into a March 24, 2017 MOU.

h. Although work was performed on the Aircraft, Innova breached the MOU by failing to deliver the completed Aircraft

i. Sierra/Innova failed to deliver the completed aircraft on September 21, 2016.

j. Although work was performed on the Aircraft, neither Innova nor Sierra ever finally completed the agreed repair and service of the Aircraft.

(emphasis added).

In the contractual damages question, the jury was asked, and it answered:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate GC System for its damages, if any, that resulted from such breach?

. . .

1. Out-of-pocket damages: The difference, if any, between the value Plaintiff paid for the MRO services and the value of the MRO services performed by Sierra or Innova.

Answer: *$1,036,428*

2. Mitigation expenses: Reasonable and necessary expenses incurred in attempting to have the Aircraft repaired and serviced by Lancair International.
Answer: ~~*900,000*~~ ~~*1,603,018*~~ *$6,603,318*

### a. *MRO Services vs. Modification Services*

Appellants' sufficiency argument on the contractual-damages question is twofold. They begin their first argument by contending that MRO services and modification services are distinct and mutually exclusive services. The jury charge, according to appellants, supports this distinction, and it keys GC System's out-of-pocket damages to only MRO services. *Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 407 (Tex. 2016) ("Our review is restricted to the jury charge as submitted when there was no objection to the instruction.").[8] Appellants further argue that GC System presented no evidence regarding MRO services and that its evidence relating to modification services, such as the fuel tank changes and new avionics, is insufficient to support the jury's award of $1,036,428. Appellants specifically reference a portion of Huffstutler's testimony wherein GC System asked, "[h]as MRO always been an important part of Lancair's business," and Huffstutler answered "[n]o[.]" Huffstutler elaborated that he "differentiate[s] between [his] two businesses" and that "Lancair is a small airplane business." Huffstutler continued "[w]hile maybe some of the work on this airplane, the subject airplane, might have been run through Lancair, it was predominantly the SkyWay Group that did the work on the airplane."[9]

GC System responds by arguing, among other things, that appellants' sufficiency challenge is "hyper-technical," that it takes Huffstutler's testimony out of context, "erases the jury charge's instructions," and ignores that, at times, all parties referred to MRO services as including modifications. In reply briefs, appellants argue that GC System "assign[s] unwarranted significance to isolated occasions on which MRO [s]ervices and [m]odification work were referred to alongside each other."

---

[8] Indeed, none of appellants' sufficiency arguments are paired with a contention of charge error.

[9] Huffstutler's testimony on which corporate affiliate performs MRO services and modification services is less than a model of clarity. From context, it appears that Lancair performs predominantly modification services and Skyway performs predominantly MRO services.

Appellants' sufficiency challenge is unavailing for two reasons. First, the jury considered evidence suggesting that the line between MRO services and modification services is not as categorical as appellants portray. For example, GC System asked Trey Thomas on direct examination, "[s]o throughout the time you were at Sierra/Innova, what title did you use when dealing with [employees of GC System]?" Thomas answered, "I believe my actual title was general manager of service and support. You say MRO MODS. I think it was actually called service and support, but during the time that this airplane was there, I believe that it is the only title I had." Thomas later testified that "I don't know that there was a material difference between service and support or MRO MODS." At one point, Devin Fogg, GC System's retained expert on aircraft appraisal and aviation, testified, "[b]ut MRO at Beechcraft, I was — that was my primary responsibility. We modified all kinds of things . . . ." GC System references this passage for the proposition that "[a]viation appraisal expert Fogg conflated modification into MRO services." However, notably, while on cross examination by Innova, Fogg was asked, "[w]ere any of the repairs that my clients performed actually signed off by a mechanic?" Fogg responded, "[a]re you talking about repairs or modifications?"

Second, the jury instructions immediately preceding the contractual damages question specifically reference three modification proposals, but they also repeatedly reference "repair and service" of the Aircraft. Thus, the jury instructions and questions, on which we must measure appellants' sufficiency challenge, combine MRO services and modification services.

### b. *Evidence of Variance between MRO Services Purchased*

Appellant's second sufficiency challenge argues that — notwithstanding MRO services and modification services being distinct and mutually exclusive — the jury was obligated to credit Sierra/Innova's completion of modification services. Appellants highlight the opinion of Donald Damschen, an operations manager at Lancair, that Sierra/Innova had completed forty-three percent

of the work before the Aircraft was transferred to Lancair as conclusively establishing a ceiling of fifty-seven percent of the amount that GC System paid to Sierra when the work commenced. *See City of Keller*, 168 S.W.3d at 810 (providing that we will reverse the judgment if, among other things, the evidence establishes conclusively the opposite of the vital fact). GC System responds by referencing Fogg's pointed testimony that, even if the Eagle wing modification had been completed and all that remained was to attach the modified wings back on the Aircraft, the industry standard would assign no value for such effort. Fogg's testimony constitutes some evidence that the jury may have credited in discounting Damschen's testimony. *See Hausman v. Hausman*, 199 S.W.3d 38, 41 (Tex. App.—San Antonio 2006, no pet.) (providing that when reviewing the sufficiency of the evidence supporting a trial court's findings, "we do not serve as a fact finder, pass upon the credibility of witnesses, or substitute our judgment for that of the trier of fact, even if there is conflicting evidence upon which a different conclusion could be supported.").

### 2. Mitigation Damages for Breach of Contract

The jury awarded GC System $6,603,318 in "mitigation expenses." In appellants' motions for j.n.o.v., they argued that no evidence supported the amount that the jury awarded. Both acknowledged that GC System presented evidence that it paid Lancair $1,205,028, but they emphasize that this figure includes work that went "beyond the scope" of GC System's agreements with Sierra. In the trial court, GC System agreed to accept a $5,000,000 remittitur. Nevertheless, the final judgment disregarded the jury's award entirely, awarding no mitigation damages.

In GC System's first cross-issue, it contends that "[a]ppellants argued below that the 'out-of-pocket damages' and 'mitigation expenses' were a double recovery." On appeal, GC System offers to accept the $5,000,000 global remittitur it offered in the trial court and a further reduction for: (1) $51,064.56 for stolen parts; (2) $587,171 for an airworthy aircraft; (3) $25,000 for lost parts; (4) $186,000 to repair hail damage; and (5) $464,000 to repair engine damage. After these

reductions, GC System suggests that $289,782.44 represents "the unrecovered expense to reconstruct the [Aircraft]."

On appeal, appellants argue that out-of-pocket and mitigation damages are "inconsistent remedies."[10] Alternatively, appellants argue that GC System's suggestion of a remittitur is insufficient because Lancair "perform[ed] over and above the scope of the work Sierra/Innova agreed to perform." Specifically, appellants reference Damschen's testimony:

> Q. Well, let's break that up then, Mr. Damschen. Were some of the squawks that Lancair found while it was working on this aircraft items that were not included within the original scope of work between GC System and Sierra?
>
> GC SYSTEM: Same objection, Your Honor. No predicate laid.
>
> COURT: Overruled. You may answer.
>
> A. Some squawks are not specific to the modifications. That's correct.

The trial court did not err in granting appellants' motions for j.n.o.v. We will uphold the trial court's j.n.o.v. if no evidence supports the jury's finding on a vital fact or if the evidence conclusively establishes the opposite of a vital fact. *City of Keller*, 168 S.W.3d at 810. In this case, GC System's appellate argument presupposes that it is entitled to $289,782.44. However, GC System fails to direct us to any evidence supporting this figure. *See Blake v. Intco Invs. of Texas, Inc.*, 123 S.W.3d 521, 525 (Tex. App.—San Antonio 2003, no pet.) ("As an appellate court, we are not required to search the record for a scintilla of evidence raising a material fact issue without more specific guidance."). Accordingly, we overrule GC System's first cross issue.

---

[10] At the charge conference, Innova argued, "[w]e would object that the question itself is improper and we have objected to the mitigation instruction as an improper measure of damages. We also object to the out-of-pocket damages and mitigation damages as improperly overlapping and resulting in double recovery."

**3.       Liability for Violations of the Texas Theft Liability Act**

In the TTLA liability question, the jury was asked:

Did [GC System] own *the property at issue*?

[GC System] owned *the property at issue* if it had —

> 1.       title to the property; or
>
> 2.       possession of the property, whether lawful or not; or
>
> 3.       a greater right to possession of the property than Defendants.

"Possession" means actual care, custody, control, or management.

(emphasis added).   The jury answered "yes," as to (1) the SkyStep cabin steps, (2) original avionics, (3) the Aircraft, and (4) parts taken from the Aircraft and used for completion of another aircraft.[11]

---

[11] In corresponding questions, the jury determined that Sierra, Innova, and the Whitesell Appellants had committed theft regarding all four items.  The jury charge instructed:

> Defendants committed theft if they —
>
> 1.       appropriated property; and
> 2.       the appropriation was without the consent of the owner; and
> 3.       Defendants intended to appropriate the property.
>
> Defendants appropriated property if they —
>
> 1.       acquired the property; or
> 2.       otherwise exercised control over the property; or
> 3.       brought about a transfer or purported transfer of title or any other nonpossessory interest in the property, whether that transfer or purported transfer is to Defendants or another.
>
> Defendants intended to appropriate the property if they had the conscious objective or desire to —
>
> 1.       withhold the property from the owner permanently; or
> 2.       withhold the property from the owner for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner; or
> 3.       restore the property only on payment of reward or other compensation; or
> 4.       dispose of the property in a manner that makes recovery of the property by the owner unlikely.

a.      *The Whitesell Appellants*

The Whitesell Appellants contend that the evidence is legally insufficient to support the jury's finding that they all committed civil theft of each of the four items listed[12] in either their direct or derivative[13] capacities. As for their direct capacities, the Whitesell Appellants argue that, at most, the evidence shows that Gulf View "provided management services for Sierra/Innova comprising accounting, legal, and financial services" and that "none of the Whitesell Appellants was involved in Sierra/Innova's day-to-day activities, nor did they give Sierra/Innova any instructions on aircraft modification, repair, or service."

GC System responds by arguing that the Whitesell Appellants are directly liable for civil theft because the jury charge "defined 'ownership' as having 'possession' and defined 'possession' as 'management.'" Therefore, according to GC System, the Whitesell Appellants' "'management services' argument actually confirms the [j]ury's finding that [the Whitesell Appellants] owned Sierra/Innova and thereby had possession of the [Aircraft.]"

GC System's textual argument proves too much. The jury charge's definition of "possession" as "care, custody, control, or management" is, by the jury charge's own terms, twice tethered to "the property at issue." Moreover, in the context of derivative liability, the Texas Supreme Court has written that "[c]reation of affiliated corporations to limit liability while pursuing common goals lies firmly within the law and is commonplace. We have never held corporations liable for each other's obligations merely because of centralized control, mutual purposes, and shared finances." *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008). GC System's textual argument turns the principle articulated in *SSP Partners* on

---

[12] In the liability questions, the jury found that Costantino and Arters did not commit civil theft of the SkyStep cabin steps and original avionics. For simplicity, we will group all the Whitesell Appellants together for our analysis.

[13] We address the derivative capacity arguments made by the Whitesell Appellants and GC System in our corporate veil-piercing analysis below.

its head, and it fails to explain why the opposite of the principle in *SSP Partners* applies to the direct liability question in this case where the Texas Supreme Court has explicitly rejected such a concept in the derivative liability context. *See City of Keller*, 168 S.W.3d at 810 (providing that we will reverse the judgment if, among other things, the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact).

We sustain the Whitesell Appellants' legal sufficiency challenge to GC System's TTLA claim.

### b.   *SkyStep cabin steps, original avionics, and other parts*

Innova argues that there is legally and factually insufficient evidence that GC System owned the SkyStep cabin steps, original avionics, and other parts and that it committed theft of them. Innova references provisions in the agreements for modification between Sierra and GC System. The general provisions in all the proposals provide:

> We may use parts from our rotable [sic] parts inventory to replace your repairable parts which will be repaired by us at your expense. If such removed parts are later scrapped, condemned or determined to be non-repairable, the parts will be disposed of at no expense to you and you will pay the list price for the replacement part, less any applicable exchange fee previously paid. *Title to parts and material furnished by us will pass to you upon incorporation in the Equipment and, simultaneously, title to the parts replaced will pass to us.* At Redelivery, we will provide you copies of all work records required by, as applicable, the FAA, JAA, CAA or other equivalent aviation authority (each, an "Approved Aviation Authority") which we agree in writing.

(emphasis added).[14]   Innova highlights that the Eagle wing modification proposal contains a specific provision that "[c]ertain equipment or parts removed from the aircraft which will not be required on the aircraft after the Modification shall be retained by [Sierra]." Additionally, the proposals for the WiFi, SkyStep cabin steps, and avionics contain a provision that all removed components not reinstalled will be retained by Sierra unless otherwise noted. According to Innova,

---

[14] Innova's opening brief references only the provision in italics.

the specific — as opposed to general — contractual provision strips GC System of any ownership interest in parts that it removes from the Aircraft as part of any modification service. Therefore, because ownership is an element of a TTLA claim and GC System possessed no ownership interest, Innova could not have committed theft under the TTLA.

GC System responds by arguing that Innova misconstrues a single sentence in the general provisions of the modification agreements. GC System further argues that the general provisions relate to general procedures for fixing broken "rotable [sic] parts," and that the sentence provides that title would pass simultaneously — title to the broken part passes to Innova while the replacement part's title passes to GC System. In its proper context, the sentence Innova emphasizes does not relate to operable parts, such as the individual items that are the subject of GC System's TTLA claim. GC System also argues that Innova affixed parts taken from the Aircraft onto several other aircraft and that such conduct is sufficient evidence of Innova's intent to deprive under the jury charge's definition of "disposing of the property in a manner that makes recovery of the property by the owner unlikely." GC System also points to Thomas's acknowledgment that Innova manufactured the SkyStep cabin steps but never installed them on the Aircraft. Thomas's testimony, according to GC System, is sufficient evidence of the jury charge's definition of "withhold[ing] the property from the owner permanently."

Although Innova relies on the provisions in the proposal in advancing its legal and factual sufficiency challenges, "[t]he interpretation of an unambiguous contract is a question of law we review de novo." *Occidental Permian, Ltd. v. Citation 2002 Inv. LLC*, 689 S.W.3d 899, 904–05 (Tex. 2024). Moreover, no party contends that the proposals at issue are ambiguous. Even if Innova correctly posits that the provision it emphasizes applies to all parts — as opposed to only rotatable parts — the "simultaneous" transfer of title provision that is essential to Innova's argument necessitates that a replacement part be installed on the Aircraft. Innova directs us to no

evidence wherein replacement WiFi, SkyStep cabin steps, avionics, or other parts were installed on the Aircraft.

We reject Innova's contractual argument regarding the SkyStep cabin steps, original avionics, and other parts.[15]

### 4.        Damages for Violations of the Texas Theft Liability Act

In the TTLA damages question, the jury was asked and answered:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate GC System for its damages, if any, that resulted from such conduct?
>
> . . .
>
> "Market value" means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling.
>
> . . .
>
> 1.        Market value of the SkyStep cabin steps of the [Aircraft]
> Answer: $ *14,000*
>
> 2.        Market value of the original avionics of the [Aircraft]
> Answer: $ *305,557*
>
> . . .
>
> 4.        Market value of the parts taken from the [Aircraft] and used for completion of another aircraft
> Answer: $ *150,000*

Innova challenges the sufficiency of the evidence of each of these answers.

#### a.        *SkyStep Cabin Steps*

Innova argues that the only evidence regarding the value of the SkyStep cabin steps was the contract for $14,000. However, the SkyStep cabin steps were neither manufactured nor

---

[15] We need not address appellants' legal and factual sufficiency challenges to the jury's award of $584,171 for the Aircraft on GC System's TTLA claim as it is barred as duplicative.

installed on the Aircraft. Furthermore, GC System presented no evidence of the market value of the unmanufactured and unaffixed SkyStep cabin steps. GC System responds by arguing that Innova concedes that the $14,000 figure is rooted in the contract and that the jury may have reasonably inferred that such a figure meets the jury charge's definition of an amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling. GC System references *Chrysler Corporation v. Schuenemann*, 618 S.W.2d 799, 806 (Tex. App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.), a case dealing with a claim under the Texas Deceptive Trade Practices Act. In *Chrysler Corporation*, our sister court held that "[i]n the absence of other proof of market value as warranted, the price agreed upon between the parties may be taken as the market value of that for which the parties contracted." *Id*. at 805.

No party contends that the measure of damages is the *original* steps on the Aircraft. Instead, all parties acknowledge that the measure is the modified SkyStep cabin steps that remained uninstalled at the time that the Aircraft was transferred from Innova to Lancair. Even considering Innova's reply brief, it fails to explain why the analysis in *Chrysler Corporation* does not apply to its sufficiency challenge.

The holding in *Chrysler Corporation* is instructive, and we overrule Innova's legal sufficiency challenge as to the damages award for SkyStep cabin steps.

### b. *Other Parts*

As for the other parts, Innova argues that GC System never identified any other parts that were taken from the Aircraft. Innova further argues that the only evidence supporting the jury's award of $150,000 was Fogg's testimony that he deducted $150,000 from the fair market value of the Aircraft "for missing logbooks and records." GC System references an email, after it had filed suit, from one of its paralegals to an employee at Lancair that inquired, "[h]ere are the parts we

have identified that were removed from [the Aircraft] by employees of Innova or Sierra. Can you please tell me what each of these parts costs?" The specific part and its corresponding value provide:

| | |
|---|---|
| Fuel shut-off valve | $1,215.93 |
| Left fuel boost pump | $2,874.63 |
| Left pressure regulating valve | $6,585.11 |
| I/B and O/B outflow valves | $20,194.50 for each of the two |

GC System contends that this email exchange "solidly demonstrates four stolen parts valued at $51,064.56," and it stipulates that it would accept a remittitur of $98,935.44, leaving a final recovery in a reformed appellate judgment of $51,064.67 for the "other parts" damage element.

We need not address either appellants' sufficiency challenges or GC System's offer of remittitur of $51,064.67 regarding the "other parts" damage element on GC System's TTLA claim for the reasons discussed in Section VII below.[16]

### 5. Negligence

The jury found that Innova and most of the Whitesell Appellants[17] were negligent regarding (i) hail damage, (ii) damage to the engines, and (iii) lost parts, logbooks, manuals, or engineer drawings.

#### a. *The Whitesell Appellants*

The Whitesell Appellants contend that the evidence is legally insufficient to support the jury's finding that they all were negligent regarding (i) hail damage, (ii) damage to the engines, and (iii) lost parts, logbooks, manuals, or engineer drawings. GC System responds by arguing:

> Whitesell Appellants' mismanagement of Sierra/Innova's MRO operations — so they could focus on STC development — drastically eroded Sierra/Innova's ability to perform the Agreement, forced Sierra/Innova to haphazardly transport the

---

[16] We also need not address appellants' legal and factual sufficiency challenges to the jury's award of $305,557 for the original avionics on GC System's TTLA claim as it is barred as duplicative.

[17] The jury found Costantino and Arters were not negligent regarding the lost parts, logbooks, manuals, or engineer drawings.

> [Aircraft] to San Antonio, and created such disorganization that Sierra/Innova failed to preserve the [Aircraft's] engines, caused extensive hail damage; and lost the [Aircraft's] logbooks, manuals, and drawings. The [j]ury had a reasonable basis to find Whitesell Appellants negligent.

Here again, GC System seeks to apply the inverse of the vicarious liability principle articulated in *SSP Partners* to a question of direct liability on which it bore the burden of proof. *See SSP Partners*, 275 S.W.3d at 455; *see also City of Keller*, 168 S.W.3d at 810 (providing we will reverse judgment if, among other things, a court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact).

We sustain the Whitesell Appellants' legal sufficiency challenge to GC System's negligence claim.

### b. *Hail Damage*

Innova argues that, although there was evidence that the Aircraft had sustained hail damage, there was no evidence establishing that its negligence (or that of Sierra) caused such damage. Specifically, Innova contends that there was no evidence of when or where the hail damage occurred. Innova highlights a July 17, 2016 "QC50" inspection report completed by Huffstutler that noted "hail damage on nose doors."

GC System responds by highlighting a February 23, 2018 report that noted hail damage on the: (1) left and right nose baggage doors; (2) left and right upper aileron skins; (3) left and right upper elevator skins; (4) left and right upper pylon skins; (5) left and right flaps; (6) left and right wing dry tips and end caps; (7) aft section of the radome; (8) left rain door assembly; and (9) nose skin forward of cockpit windshields. As for the hail damage noted in the February 23, 2018 report, Fogg testified that he had "never seen hail damage on gear doors that are under an airplane. You have to roll upside down or park it upside down to get hail damage. I don't know how that would

happen." Fogg further testified that such damage affected areas that controlled the Aircraft's maneuverability, testifying:

> [T]here was hail damage to the control surfaces and other parts of the aircraft from hail falling out of the sky, not as you were flying, which means it hit the top areas. Unbalanced control surfaces, if a dent is deep enough in a control surface, you can't fill it. You have to replace the skins. That's an expensive process.

> . . .

> Ailerons, flaps. It's the things that make the airplane bank, pitch up and down or do this. Primarily we're talking about these and the flaps.

Furthermore, on redirect examination by GC System, Damschen testified:

> Q. . . . Looking on the left at the damage, hail damage that was noted when the plane got to Lancair is left and right nose baggage doors hail damage similar to hail damage on nose doors?

> A. Yes.

> Q. All right. Is hail damage on nose doors left and right upper aileron skin, is that the same area?

> A. No.

> Q. That's a different area, correct?

> A. That's correct.

> Q. Left and right up[per] elevator skins, is that a different area or is that the hail damage on the nose doors?

> A. Different.

> Q. Left and right upper pylon skins, is that the same area as the nose doors?

> A. No.

> Q. Is that a different area?

> A. Yes.

> Q. Left and right flaps. Is that the same area as hail damage on nose doors?

> A. No.

Q.    Is that a different area?

A.    Yes.

Q.    Left and right wing dry tips and end caps.  Is that the same as hail damage on nose doors?

A.    No.

Q.    Is that a different area with hail damage?

A.    Yes.

Q.    Aft section — aft section of radome.  Is that the same description as hail damage on nose doors?

A.    No.

Q.    Left rain door assembly.  Is that the same area as hail damage on nose doors?

A.    No.

Q.    Lastly, nose skin forward of cockpit windshields.  Is that the same description of hail damage as hail damage on nose doors?

A.    No.

Q.    So would you agree with me that there are one, two, three, four, five, six, seven, eight, nine different areas where hail damage was noted when the aircraft came to Uvalde and only one of those two areas is the same as what Mr. Huffstutler noted in item number eight?

A.    That's correct.

Damschen's testimony asserts that, when the Aircraft was transferred from Sierra/Innova to Lancair, it exhibited more hail damage than when it was initially left with Sierra.  Additionally, the jury may have reasonably inferred that Fogg's reference to "control surfaces" meant that the Aircraft had sustained hail damage to an area that was not the "nose doors" noted by Huffstutler.  Fogg explained that the aileron and flaps "make the airplane bank, pitch up and down . . . ."  Innova fails to explain how the testimony of Fogg and Damschen affect our legal and factual sufficiency review.

We overrule appellants' legal and factual sufficiency challenge regarding the hail damage.

### c.     *Engines*

Accompanying the jury charge question relating to the engines is an instruction that "Innova failed to preserve the engines." Although Innova does not challenge the breach element, it nevertheless contends that GC System presented no evidence of the relevant standard of care and causation.[18] GC System argues that the testimony of John Sloan, a former aircraft mechanic and Innova's retained expert, and a "hangar audit" emailed from Steven Holliday, an Innova employee, to Gary Buchanan, a marketing professional at Sierra/Innova, and Thomas contain legally and factually sufficient evidence of the standard of care and causation elements.

On cross examination by GC System, Sloan testified:

Q.     Did you say that this is the only engine that you have seen in your career that was not properly preserved?

A.     I would say that.

. . .

Q.     If an aircraft is going to be sitting as long as this aircraft sat at Sierra Innova, would you agree that engine preservation techniques or measures would be a standard procedure under those conditions?

A.     I wouldn't say it — I wouldn't say it like that.

Q.     How would you say it, then?

A.     It's a required — it's a required procedure, not a suggested procedure. It's in the maintenance manual. It says that you should preserve an engine if it's going to be sitting more than 90 days. They don't leave any leeway. You do what the book says.

---

[18] Appellants also argue that "there was no evidence of an injury." They reference the testimony of Paul Gunlock, program director over Pratt & Whitney engines at Dallas Airmotive, wherein he noted several pieces of the engine that were damaged by activity unrelated to a lack of preservation. GC System argues that appellants stipulated as to the cost to repair the engines. Indeed, the final judgment provides that "Sierra and Innova also agreed GC System sustained damages for the engines of $464,000." GC System also argues that the only issues for the jury to decide were (1) whether appellants owed GC System a duty to preserve the engines and (2) whether failing to preserve proximately caused GC System damages. Liberally construing appellants' argument, we conclude that their argument regarding "no evidence of an injury" is a legal sufficiency challenge to the causation element.

. . .

Q. Now, if an MRO operator like Sierra Innova knows, one, that engines should be preserved, and two, that engines have not been preserved, what should they do to resolve the issue?

A. They should have an inspection done.

Q. And who would do the inspection?
A. Any number of places that are authorized to tear an engine down that far, Lancair Motors, Pratt & Whitney, Vector Aerospace, to name a few.

. . .

Q. Do you know if the engines and exhaust were — excuse me, the engines were covered with those plastic bags during the entire time the plane was in Innova Sierra's possession?

A. I have no idea.

Q. Do you know whether Sierra Innova monitored the amount of condensation with a humidity indicator and replaced desiccant bags as required?

A. I have no knowledge of that.

Q. Now, if that kind of detail is in the Pratt & Whitney manual, should Innova Sierra be referring to that Pratt & Whitney manual and following it in order to assure that the engines are airworthy when it releases the aircraft?

A. They should.
. . .

Q. And had these engines been properly preserved, we've already agreed that Dallas Airmotive would have never had them in its shop, correct?

A. Correct.

. . .

Q. So, it isn't [GC System's] fault that these engines got to Dallas Airmotive, is it?

A. Not really, no.

Q. And it isn't [GC System's] fault that Sierra Innova didn't preserve these engines, is it?

A. No.

Q. So, in comparison of whose fault was it that they even had to get to Dallas Airmotive, that's Sierra Innova's fault, is it not?

A. Probably, yeah.

The hangar audit notes that "[t]he engines have not been preserved; they are considerably past the preservation requirement in the Pratt & Whitney maintenance manual. (Still have not seen a P&W rep here to evaluate them as per the P&W manual requirements)."

Sloan's testimony is evidence that Innova: (1) should have been familiar with the Pratt & Whitney manual, including the manual's preservation requirement for engines that have remained idle for ninety days; (2) should have arranged, at a minimum, for an inspection of the Aircraft's engines in light of their being idle and unpreserved for more than ninety days; and (3) did not preserve the engines. This evidence supports a reasonable inference that Innova's lack of preservation caused GC System to have the unpreserved engines evaluated at Dallas Airmotive. Moreover, the hangar audit is some evidence that Innova knew of a "preservation requirement."

We overrule Innova's legal and factual sufficiency challenge relating to the engines.

### d. *Lost parts, logbooks, manuals, and engineering drawings*[19]

Innova complains that GC System presented legally and factually insufficient evidence to establish: (i) a standard of care; (ii) a breach of that standard; and (iii) that Sierra/Innova proximately caused the loss of unspecified parts, logbooks, manuals, and engineering drawing.

As for the standard-of-care element, GC System references the testimony of Tracy Bartos, a Sierra/Innova sales professional. She was asked: "[Logbooks] are important so that the FAA can follow the documentation on the aircraft?" She answered: "[c]orrect." Fogg opined as to the

---

[19] The section heading in appellants' brief includes the terms "parts" and "manuals." However, the body of appellants' argument does not survey any evidence relating to items within these two categories.

standard of care for parts, noting that some repair manuals permit taking parts off one airplane to use on another. Yet, even if permitted, it is customary to receive the airplane owner's written permission to swap parts. This documentation, known as an FAA form 8130, ensures that a correct airworthy part is traded. Fogg also testified that in order to return an aircraft to airworthiness, essential paperwork must be maintained. The Aircraft had no such paperwork. The testimony of Bartos and Fogg constitute legally sufficient evidence regarding the standard of care for the lost parts, logbooks, manuals, and engineer drawings. We overrule Innova's legal and factual sufficiency challenge as to the standard of care element relating to the lost parts, logbooks, manuals, and engineering drawings.

Innova references no evidence regarding the lost parts. GC System references an April 25, 2017 email from Thomas to Bartos, regarding the Aircraft that states in relevant part:

> We seem to have lost a box of parts in the move which will likely have to be remade in manufacturing. I know you and James have spoken to Donnie about this one[.]
>
> . . .
>
> Missing three standby instruments — I recommend we sell customer the electronic all in one display that Robert mentioned and give a credit for the lost instruments. This decision is holding up instruct [sic] panel cut.

GC System also references a January 8, 2019 email from Damschen to Mara, after Lancair took over work on the Aircraft, wherein Damschen notes:

> During the re-assembly of the aft baggage[,] we discovered that a Ski Tube kit was previously installed[;] however[,] after searching the racks of what we have left, it's been discovered it didn't come back from Innova. The rest of the kit pieces, such as the attaching brackets are here. The question I have is . . . would you like us to purchase a replacement or make modification to the baggage without the Ski Tube installed? I know the cost of the entire [kit] is over $5000.00, we have a call into the supplier to see if they'll sell just the tube.

As for the engineering drawings, Innova argues that the Aircraft was delivered to Sierra's Uvalde facility without any wiring diagrams. Innova references a statement by Joe Vara, a

passenger who accompanied Mara on a segment of the Aircraft's flight from the Czech Republic to Uvalde. According to Innova, Vara informed Mara that GC System had no "existing wiring diagrams." Additionally, Mara testified that "for this aircraft, we didn't have any old projects or diagrams." GC System references a June 20, 2017 email from Robert Glass, an avionics tech at Innova, to Samantha Hillis, wherein Glass writes, "I [w]as wanting to see if you had any information on the S1390-102 [d]rawings . . . I think this is the actual seat build, need to check if the seat has been put together properly. It looks like there might be some bushing missing, plus mounting hardware. . . ." Hillis responded, "[u]nfortunately that drawing was one I never found. I only have sheet 3 or 6. I will get with James to see if he happen[s] to have a copy of it, but I would have to go digging through the 2nd floor to see if I could find it."

As for the logbooks, Innova argues that the only evidence GC System offered were FedEx receipts indicating that it shipped the logbooks from Prague to Dallas Airmotive, *after* the Aircraft had already left Innova's possession. Innova argues that the only inference that may be drawn from the receipts is that Innova "could not lose the logbooks or manuals because [it] never received them in the first place." GC System references the testimony of John McKinney, a supervisor at Sierra, wherein he testified:

Q.    Do you know whether the logbook for the [Aircraft] was lost at Sierra?

A.    There was a point in time they thought they were misplaced.

Q.    Do you know whether they ever found them?

A.    No, sir.

Q.    Do you know how long a period of time it was that the logbooks were misplaced during your employment at Sierra?

A.    No, sir.

Q.    Do you know who the logbooks were handed to and misplaced them?

A.    The logbooks were always given to the quality assurance department.

GC System also references a May 21, 2017 email from Buchanan to other Innova employees, wherein he writes, that "[i]t came to my attention on Friday that the logbooks for [the Aircraft] are missing.  As you guys know, this is beyond critical that these be found and put into a secure location."

As for causation, Fogg estimated that it could cost "at least" $25,000 to recreate just the logbooks on the Aircraft.  It would cost "somewhere in that same area for the wiring diagrams."  He also opined that recreating logbooks, manuals, and wiring diagrams is labor intensive.

Appellants' legal sufficiency challenge regarding the breach and causation elements is overruled based on the additional evidence GC Systems directs us to.  To the extent appellants intended to lodge a factual sufficiency challenge, that challenge is overruled as inadequately briefed.

####    e.    *Market Value*

Relatedly, Innova argues that there is no evidence to support the jury's finding that the lost parts, logbooks, manuals, or engineer drawings had a *market value* of $200,000.  Innova contends that the only evidence was Fogg's testimony that it would cost "[a]t least" $25,000, each, to recreate the logbooks and the engineering drawings and that he deducted $150,000 from his valuation of the Aircraft to account for missing logbooks and records.

GC System responds by arguing that Fogg's testimony is sufficient to sustain the jury's award of damages.  GC System also argues that the jury considered a "long list of missing parts and the lack of evidence that []Innova ordered and delivered these parts."  GC System specifically identifies sealant, screws, an emergency exit cover, missing hardware, a ski tube kit, and a fire detection annunciator.

GC System does not direct us to the basis for Fogg's estimate of $150,000, and we conclude that his overall estimate is conclusory. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009) ("But if no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection."). Nevertheless, we have already discussed Damschen's observation that the Aircraft was missing a Ski Tube and that an entire Ski Tube kit costs $5,000. Moreover, Innova's briefing fails to explain why the missing sealant, screws, emergency exit cover, and a fire detection annunciator should not be considered in the damage element. Therefore, there is some evidence supporting the jury's finding that GC System incurred damages for the lost parts, logbooks, manuals, or engineer drawings. However, the actual amount remains indeterminable. *See Pointe W. Ctr., LLC v. It's Alive, Inc.*, 476 S.W.3d 141, 150 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) ("We have held that there appears to be some evidence of the damages incurred in repairing [the plaintiff's] premises but that the actual amount of damages is indeterminable."). Under these circumstances, we must remand for a new trial. *Id*.

### 6. Fraud

#### a. *The Whitesell Appellants*

The jury found that each of the Whitesell Appellants committed fraud. On appeal, the Whitesell Appellants contend that "[r]egarding direct liability, it is undisputed that none of the Whitesell [Appellants] had any contact with GC System until after Innova shut down in November 2017." We construe this argument as challenging the first fraud element — that each of the Whitesell Appellants failed to disclose or actively concealed a material fact.

GC System does not respond by referencing a failed disclosure or active concealment of a material fact by any of the Whitesell Appellants. Instead, GC System argues that the jury may have found that the "Whitesell Appellants hid behind Sierra/Innova's façade, controlling

Sierra/Innova and its communications with [GC System]." GC System pointedly asserts that the "Whitesell Appellants controlled Buchanan who was communicating with [GC System]." It references Thomas's January 27, 2017 email and three emails between Bartos, Buchanan, and Arters which, in their entirety, provide:

> From: Bartos
> To:   Buchanan; Coggeshall
> Sent: November 14, 2016
>
> Here is a draft of the letter to Petr for [the Aircraft].
>
> Please review and let me know what changes need to be made. I eluded [sic] to the same delivery of 2nd quarter 2017 even after the cancellation of the fuel tank mod. I'm not sure what delivery really is. Doug's report he sent last week says May 2017.
>
> I've attached his previous correspondence as a reference.
>
> - - -
>
> To:   Buchanan
> From: Arters
> Sent: November 14, 2016
>
> Adam, Everyone understands that this not doing the XR Tank mod is going to create a credit for the [sic] this customer. I want to make sure everyone knows, we are about to respond to the customer. Just want to double check before we send the update.
>
> - - -
>
> To:   Buchanan
> From: Arters
> Sent: November 15, 2016
>
> I think we may want Rob & Vince to review this letter so they are aware what we are communicating to the customer.

None of these emails support GC System's proposition. More importantly, GC System again confuses direct and vicarious liability and seeks to apply the inverse of the vicarious liability principle articulated in *SSP Partners* to a question of direct liability on which it bore the burden of proof. *See SSP Partners*, 275 S.W.3d at 455; *see also City of Keller*, 168 S.W.3d at 810 (providing

we will reverse judgment if, among other things, a court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact).

We sustain the Whitesell Appellants legal sufficiency challenge to GC System's fraud claim.

### b. *Innova's Arguments*

Innova begins its argument relating to the jury's affirmative answer on GC System's fraud claim by summarily arguing that GC System presented no evidence of all four elements of a fraud claim contained in the jury charge, those being that: (1) Innova failed to disclose or actively concealed a material fact; (2) Innova knew GC System was ignorant of the fact and did not have an equal opportunity to discover the truth; (3) Innova intended to induce GC System to take some action or refrain from acting by failing to disclose the fact; and (4) GC System suffered an injury as a result of acting or failing to act without knowledge of the undisclosed fact.

Next, Innova launches into four more specific arguments without tethering any to a particular element. First, Innova points to the modification proposals' acknowledgement that timeframes are "approximate" and that this term enshrined the concept of "excusable delay."[20] Liberally construing this argument, we conclude that it is aimed at the first fraud element — that Innova had a duty to disclose a material fact.

Second, Innova argues that GC System's position that it had a duty to apprise GC System of every action and seek GC System's approval for every action is not supported by the record or Texas law. However, Innova neither references authority supporting its contention that GC

---

[20] The agreements' standard terms and conditions include a paragraph on "excusable delay," which provides:

> You will excuse us from, and we will not be liable for, any delay in our performance due to causes beyond our reasonable control and, in the event of such delay, we may invoice you for all completed Services. If you cause a delay, your Equipment may be removed from Service, which may result in a greater than day-for-day delay in the completion of Services.

System's "duty to apprise" theory is barred by Texas law — as opposed to a factual contention that the jury must assess — nor evidence that GC System's theory is contrary to aviation industry customs regarding the MRO and modification services that Sierra contracted to provide. From context, we gather that Innova's attack on GC System's "duty to apprise" theory is also aimed at the first fraud element.

Third, Innova references favorable testimony from several of its employees that Sierra/Innova intended to complete the MRO and modifications services. It also references exhibits wherein Innova provided progress reports and sought approval for additional work. Nevertheless, GC System, according to Innova, insisted on an "unrealistic" delivery date. Innova emphasizes that delays in the type of MRO and modification services that GC System ordered were inherent, as evidenced by the fact that it took Lancair approximately thirty-six months to complete all of the work. Indeed, Huffstutler acknowledged, "[o]ld aircraft are difficult to return to service when extensive work is done on them." Liberally construing this argument, we conclude that it is aimed at the third fraud element — that Innova intended to induce GC System to take some action or refrain from acting by failing to disclose the fact.

Fourth, Innova's request for a mutual release before transferring the Aircraft to Lancair is, according to it, no evidence of any fraud element, especially a material misrepresentation or an omission on which GC System justifiably relied to its detriment. On its face, this argument assails the evidence underlying the first and second fraud elements.

### c.      *GC System's Responsive Arguments*

GC System responds by referencing *Four Brothers Boat Works, Inc. v. Tesoro Petroleum Co.*, 217 S.W.3d 653, 670–71 (Tex. App.—Houston [14th Dist.] 2006, pet. denied), for the proposition that "when one makes a representation, he has a duty to disclose new information when he is aware the new information makes the earlier representation misleading or untrue." It argues

that Innova "purposefully concealed the delays, repeatedly fed [GC System] incorrect timelines, and falsely stated []Innova was on track." GC System references three relevant pieces of evidence.

First, it points to a January 27, 2017 email that Thomas sent to Buchanan and Bartos, stating:

Here is [a] summary of our meeting on [the Aircraft] today followed by my recommendations.

Current completion levels:
- Eagle wing 45%
- XRtank 5%
- GSO1SP 80%
- Interior mods 0%
- WiFi/iCabin 20%
- Tail reassembly 0%
- Engine hang 0%

Doug owns the RAIL going forward but here are some items we will track to start
1. Wing bushings
2. Garmin displays locate
3. Shortage list
   a. Outflow valves borrowed at some point
   b. Boost pump need to order replacement
   c. Heated leading edges lead time
   d. Straps
   e. XR tank pump
   f. XR tank control box
4. WiFi engineering
5. Armrest
6. Aft Divan
7. Glareshield
8. Forward sofa
9. Forklift for KSAT
10. Engine hoist
11. Drawing inventory
12. Crew belts
13. Known aircraft squawks

Further to our previous conversations[,] Steve Carlson can assist from PM perspective until SWAT programs demand his attention again see him helping while Doug is in Uvalde for sure.

We still have 4900 man hours to go to finish everything. *With 4 dedicated techs working full time that is 8 months*

We still have an issue with expertise[.] No one at KSAT has experience doing these mods[.] While they could "figure it out," learning curve will only extend the duration of the project.
Recommendations:

- Truck wings back to manufacturing so that the experienced crew there can finish them
- Eliminate the XR tank from the work scope
- Hire Bobby Gonzalez contract to assist with Eagle wing in Uvalde
- Hire Gary Cooper contract to assist with Eagle wing in Uvalde then work at KSAT
- Hire Daniel Granado for some more high level tech help in San Antonio to free up Tony/Robert to focus more on Eagle project
- Come clean with the customer about where we are[.] We either deal with it now or later[.]

*None of these recommendations accelerates the project they just get us to making progress.* Remember we still have Super II install coming up as well.

For now we will try and work towards getting the tail and engines put back together first.

I'm open to further suggestions figured we should talk through this before copying others.

(emphasis added).

Second, GC System references a March 22, 2017 email from Thomas to several Innova employees:

Gents

Doug may have mentioned this but he will not be in Thursday[,] and I want to make sure you receive this message.

We have reps for [the Aircraft] coming in Thursday at 0900. This will possibly be a tense meeting[,] so I need your help putting our best foot forward.

When you guys arrive at 0630[,] I need all hands on deck to spruce up the area as much as possible.

1. Dust and wipe down the aircraft
2. Vacuum inside aircraft if needed
3. Dust/blow off racks
4. Straighten up parts on racks (try not to have piles, etc)

5.  Sweep and zamboni [sic] the floor
6.  Open hangar doors so there is as much light as possible

After everyone has chipped in to make the area look as good as possible, there needs to be a minimum of 3 guys on the job until I confirm our guests are gone. There is no higher priority for the morning. . . .

Third, GC System references the March 24, 2017 MOU, which provides:

A Meeting was held March 24, 2017 between GC System and Sierra Industries. In attendance were:

GC System:          Petr Malacek, Spenser & Kauffmann
                    Petr Mara, GC System
                    Radek Kindl, GC System

Sierra Industries:  Gary Buchanan
                    Trey Thomas
                    Tracy Bartos
                    James Coggeshall

Both parties discussed the following:

1.  No XR Fuel Tank Installation

    •   Customer will receive a credit of $275,000
    •   All squawks costs will be deducted from the tank credit
    •   All squawks must be approved by the Customer

2.  Sierra will deliver the aircraft current on inspections, SB's & AD's. All visual inspections associated with phase inspections will be performed at no additional charge. Squawks generated during these inspections will be submitted for approval and deducted from the tank credit.

3.  Sierra will coordinate RVSM with the Customer

4.  Exterior paint cost will be deducted from the tank credit per the attached proposal.

*Sierra Industries understands time is of the essence and that the Customer needs the aircraft by mid-July. While we cannot make guarantees, we will make our best effort to achieve that date*; it is understood that the interior mod and the exterior paint are performed by a third party and that Sierra has no control of their performance. It is further understood that as of today, a paint slot has not been secured with the paint vendor.

(emphasis added).

### d.    *Liability Analysis*

Returning to appellants' four specific legal sufficiency arguments, they labor under the impression that each specific piece of evidence referenced conclusively negates the corresponding element. However, evidence is conclusive only if reasonable people could not differ in their conclusions, which depends on the facts of each case. *City of Keller*, 168 S.W.3d at 816. Appellants do not frame the four specific pieces of evidence within "the facts of [this] case." Accordingly, appellants' legal sufficiency challenge fails.

Nevertheless, even assuming without deciding that (1) the term "approximate" in the May 2016 modification proposals enshrined the concept of "excusable delay;" (2) GC System's "duty to apprise" theory is barred by some unspecified Texas law or conclusively established aviation industry custom; and (3) Innova's request for a mutual release before transferring the Aircraft to Lancair all constitute no evidence of the first fraud element — that Innova failed to disclose or actively concealed a material fact — there remains legally sufficient evidence. Thomas's January 27, 2017 email states that "[w]e still have 4900 man hours to go to finish everything. With 4 dedicated techs working full time that is 8 months." Appellants reference no evidence that Innova dedicated more than four technicians to the Aircraft nor do they reference any updated completion timelines. Nevertheless, two months later, on March 24, 2017 Innova represented in the MOU to GC System that it would use its "best effort to achieve" completion of the Aircraft by mid-July 2017. The jury may have reasonably inferred that, assuming Innova followed through on dedicating four technicians, the earliest Innova may have anticipated completing the MRO and modification services on the Aircraft was the last week of September 2017. Therefore, the jury may have reasonably inferred that the estimate of completing the MRO and modification services by mid-July 2017 was, at the very least, a failure to disclose a material fact.

The same may be said of the second fraud element — that Innova intended to induce GC System to take some action or refrain from acting by failing to disclose the fact. The jury may have reasonably inferred that Innova intended to induce GC System to sign the March 24, 2017 MOU from Thomas's March 22, 2017 email imploring Innova employees to look like they had been diligently working on the Aircraft, when the jury may have reasonably inferred from the same email that Innova employees had not been diligently working on the Aircraft.

### e.    *Damages*

Innova complains that the evidence is insufficient to support the jury's award of $750,000 for the loss of use of the Aircraft due to fraud. It argues that "Kindl testified that [GC System] paid $523,000 to rent another aircraft during the period the Aircraft was out of service." However, appellants further complain that even an award of the $523,000 is unsupported by evidence because Kindl admitted "this amount was not adjusted to account for the reasonably necessary expenses GC System would have incurred to maintain and operate the Aircraft had it been in service, such as fuel, pilot salary, and landing fees." On cross examination by Whitesell, Kindl testified: [21]

> Q.    [R]egardless, the cost of the fuel for that flight is not broken out here, is it?
>
> A.    No, it's not.
>
> Q.    Nor pilot cost or any other cost associated with a flight, correct?
>
> A.    No, it is the whole cost we had to spend.
>
> Q.    And if you had had [the Aircraft,] you would have had to pay fuel cost, correct?
>
> A.    Correct.
>
> Q.    You would have to pay for the landing cost?

---

[21] For context, Kindl reviewed a GC System's exhibit titled "Czech to English transactions." However, this exhibit was not admitted into evidence.

Q.     A.     Correct.

Q.     There would have been wear and tear costs on your aircraft, correct?

A.     That's the depreciation.

Q.     But none of the costs are broke out and taken out of the invoice that we just looked at it, are they?

A.     No, we ordered a service.

. . .

Q.     If [the Aircraft] had made those flights, GC System would have incurred the same costs for fuel or for landing costs, et cetera, correct?

A.     You mean the same costs?

Q.     Would have been fuel costs.

A.     And landing.

Q.     Right.  Because [the Aircraft] doesn't fly on fairy dust, right?

A.     No, I don't cast any doubt on that.

GC System argues that the jury may have reasonably inferred that Kindl's reference to "order[ing] a service" meant that its payment of $523,000 was only for the rented aircraft and that GC System also paid for the rented aircraft's fuel, pilot, and landing fees.

The concession that appellants believe Kindl made, at most, yields an equal inference that the $523,000 rental figure was either inclusive or exclusive of the attendant costs of the rented aircraft's fuel, pilot salary, and landing fees.  *United Rentals N. Am., Inc. v. Evans*, 668 S.W.3d 627, 642 (Tex. 2023) (internal quotation marks and citation omitted) ("Testimony that gives rise to any number of inferences, none more probable than another, is legally insufficient to support the inference of a fact.").

We overrule Innova's legal and factual sufficiency challenges to GC System's fraud claim.

**7.**     **Negligent Misrepresentation**

Under the jury charge, negligent misrepresentation occurs when: (1) a party makes a representation in the course of his business or in a transaction in which he has a monetary interest; (2) the representation supplies false information for the guidance of others in their business; and (3) the party making the representation did not exercise reasonable care or competence in obtaining or communicating the information. For GC System to have justifiably relied on any representation, (1) GC System must have actually relied on the information, and (2) its reliance must have been reasonable.

**a.**     *The Whitesell Appellants*

The jury found the Whitesell Appellants liable on GC System's negligent misrepresentation claim. As with GC System's fraud claim, the Whitesell Appellants challenge the legal sufficiency supporting the jury's answer.

GC System responds by arguing that the "Whitesell Appellants reviewed and approved the proposals and were well aware of Sierra/Innova's capacity," and "[a]s such, they are liable for negligent misrepresentation." As support for this contention, GC System references the emails from Buchanan either directing Bartos to forward proposals to Arters or directly forwarding such proposals to Arters that we previously discussed in our analysis of GC System's fraud claim against the Whitesell Appellants. GC System references *Cook Consultants, Inc. v. Larson*, 700 S.W.2d 231, 233 (Tex. App.—Dallas 1985, writ ref'd n.r.e.), a case wherein a landowner sued a land surveyor for negligent misrepresentation. The surveyor admitted to providing an "erroneous" survey, but contended that absent privity, it owed the buyer no duty. *Id.* at 233–34. Our sister court held that:

> The closeness of the connection between the negligent act and the injury validates the inference that the injury was reasonably foreseeable, irrespective of contractual privity. [The surveyor] executed the survey for a builder of a home subsequently

sold to [the buyer]; the inference that [the surveyor] foresaw or reasonably should have foreseen the possibility of harm to [the buyer] is inescapable.

*Id*. at 236.

*Cook Consultants* was penned in 1985. "Texas has since rejected a foreseeability standard in favor of the Torts Restatement approach." *In re Soporex, Inc.*, 446 B.R. 750, 780 n.24 (Bankr. N.D. Tex. 2011) (writing in reference to *Cook Consultants*). In *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 920 (Tex. 2010), the Texas Supreme Court wrote:

> For nearly two decades, we have similarly embraced the Restatement approach. *See McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 791 (Tex. 1999); *see also Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991). In *McCamish*, we examined whether the absence of an attorney-client relationship precluded a third party from suing an attorney for negligent misrepresentation under Restatement section 552. *McCamish*, 991 S.W.2d at 788. We held that, under certain circumstances, section 552 causes of action can be brought by third parties against attorneys, just as they have been legitimately brought against auditors, accountants, and other professionals. *Id*. at 791.
>
> We explained that "a section 552 cause of action is available only when information is transferred by an attorney to a *known* party for a *known* purpose." *Id*. at 794 (emphasis added). Under section 552, a "known party" is one who falls in a limited class of potential claimants, "'for whose benefit and guidance [one] intends to supply the information or knows that the recipient intends to supply it.'" *Id*. (quoting RESTATEMENT (SECOND) OF TORTS § 552(2)(a)). This formulation limits liability to situations in which the professional who provides the information is "aware of the nonclient and intends that the nonclient rely on the information." *Id*. Unless a plaintiff falls within this scope of liability, a defendant cannot be found liable for negligent misrepresentation.
>
> *McCamish* has served as a guidepost for our courts of appeals in analyzing the tort of negligent misrepresentation, in contrast to earlier decisions applying a broader standard. We reaffirm today that *McCamish* represents Texas law under section 552 of the Restatement.

(footnotes omitted).

GC System references no evidence that Arters — or any of the other Whitesell Appellants — "provided the information" in the proposals to GC System. Therefore, GC System has not shown a transfer of information by a Whitesell Appellant to GC System, as "a known party for a

known purpose." *See id.* We sustain the Whitesell Appellants legal sufficiency challenge to GC System's negligent misrepresentation claim.

### b.      *The Representation Prong*

Innova summarily argues that there is legally and factually insufficient evidence on all three elements of a negligent misrepresentation claim. GC System counters by highlighting the timeline. In light of Innova's cursory analysis, we conclude that Innova's legal sufficiency challenge to the representation prong of GC System's negligent misrepresentation claim fails for the same reasons as its legal sufficiency challenge on GC System's fraud claim fails. *Cf. Bever Props., L.L.C. v. Jerry Huffman Custom Builder, L.L.C.*, 355 S.W.3d 878, 892 (Tex. App.—Dallas 2011, no pet.) (holding that same evidence of "representation" raised fact issue as to appellant's claims for fraud and negligent misrepresentation). We further conclude that Innova's factual sufficiency challenge is overruled as inadequately briefed. *See* TEX. R. APP. P. 38.1(i)

### c.      *Reliance*

Innova also argues that there is legally insufficient evidence that GC System justifiably relied on any representation made by Sierra or anyone affiliated with either Sierra or Innova. It argues that although Kindl testified that he relied on Innova's representations, his testimony is essentially countered by the contractual provisions providing that timeframes were "approximate" and that the term "approximate" injected the concept of "excusable delay" into the delay. GC System responds by arguing that Mara's and Kindl's testimony is sufficient to satisfy the justifiable reliance element.

The trial court admitted modification proposals relating to an extended fuel tank and WiFi. Both proposals are signed by Mara, on behalf of GC System, and Coggeshall, on behalf of Sierra. The sections for "period of performance" are "approximately 16 weeks" for the extended fuel tank and "approximately 2 weeks" for the WiFi. Both proposals include an introduction that reads,

"Sierra Industries' humble start, with 10 employee and 11,000 square feet of hangar space, gave way to the world's largest Citation aircraft modification center. Sierra's love for aircraft helped them grow into 80 experts in modifications, maintenance, quality assurance and logistics." The Aircraft was delivered to Sierra in July 2016. On direct examination by GC System, Mara testified:

Q. Did anybody from — whether Tracy Bartos, or anybody else at Sierra or Innova at this time, inform you that the aircraft could not be completed for eight months from August the 15th, 2016 because of their failure to order the parts?

A. No, no one did.

Q. As somebody who is in this industry and who provides services regarding the maintenance of aircraft, do you have an opinion regarding whether or not withholding this information from a customer is dishonest?

A. It's dishonest and very unprofessional.

. . .

Q. And is Ms. Bartos correct in her e-mail here that if you had been told this information, they would have had a very, very disgruntled customer?

A. She's right there.

. . .

Q. In September of 2016, did Tracy Bartos or Mr. Coggeshall or Mr. Buchanan inform you, or anybody else at GC System, that the aircraft could not be delivered until the second quarter of 2017?

A. No, they didn't inform me.

Q. Is she correct in her statement that "I know this is going to explode, since it will be the first time he hears about the delivery being second quarter next year"?

A. I assume I would have exploded.

Q. Did you rely at this time on Tracy Bartos telling you the truth about the status of the aircraft?

A. At that time, I had no reason to doubt.

Q.      And also, in September of 2016, did you rely on Mr. Coggeshall and Mr. Buchanan to tell you the truth regarding the status of the aircraft?

A.      I didn't know, at that time, Mr. Gary Buchanan, but I have been in contact, both, with Mr. Coggeshall and Mrs. Bartos. And at that time, I thought that they are providing me with truthful information.

On examination by GC System, Coggeshall reviewed the agreements and testified:

Q.      All right. And when you signed those documents, each and every one of these proposals, did you sign them because you were representing these to be truthful?

A.      Yes.

Q.      Even though you did not know what was in the terms and conditions, correct?

A.      Correct.

Q.      Even though you didn't know whether there were ever 80 experts while you were making these proposals?

A.      Correct.

Q.      But you did this expecting my client to do business with you?

A.      Yes.

In Innova's reply brief, it argues that Mara's testimony that he "relied on Sierra/Innova to have the experience to complete the work is insufficient, standing alone, to demonstrate that GC [System] justifiably relied on Sierra/Innova's alleged representations." However, as noted, Mara also testified that he "would have exploded" had he known of the more realistic timeline that Innova knew of as early as August 2016, approximately three months after the agreements had been executed. Furthermore, Innova fails to explain — in either its opening or reply brief — how Coggeshall's admission that he expected GC System to rely on the representations Sierra made in the agreements weighs in our analysis of the evidence supporting the justifiable reliance element. We conclude that Coggeshall's admission, together with Mara's testimony that he "would have

exploded" had he known of the more realistic timeline, constitute legally and factually sufficient evidence that GC System justifiably relied on Innova's representations.[22]

We overrule Innova's legal and factual sufficiency challenges to GC System's negligent misrepresentation claim.

### 8. Texas Uniform Fraudulent Transfers Act

In the TUFTA question, the jury was asked and answered:

Did Sierra or Innova transfer any of the assets listed below with actual intent to hinder, delay, or defraud any creditor?

In determining actual intent, you may consider, among other factors, whether —

1. The transfer was to an insider.
2. Sierra or Innova retained possession or control of the property transferred after the transfer.
3. The transfer was concealed.
4. Before the transfer was made, Sierra or Innova had been sued or threatened with suit.
5. The transfer was of substantially all of Sierra or Innova's assets.
6. Sierra or Innova absconded.
7. Sierra or Innova removed or concealed assets.
8. The value of the consideration received by Sierra or Innova was reasonably equivalent to the value of the asset transferred.
9. Sierra or Innova was insolvent or became insolvent shortly after the transfer was made.
10. The transfer occurred shortly before or shortly after a substantial debt was incurred.
11. Sierra or Innova transferred the essential assets of the business to a [lienholder] who transferred the assets to an insider of Sierra or Innova.

"Insider" includes —

a. a director, officer, or person in control of the Debtor;
b. a partnership in which the Debtor is a general partner;

---

[22] We are aware that, regarding the justifiable reliance element, the Texas Supreme Court has held that "world-savvy participants entering into a complicated, multi-million-dollar transaction should be expected to recognize 'red flags' that the less experienced may overlook." *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 656 (Tex. 2018). Innova made no mention of the "red flag" rule articulated in *JPMorgan Chase* and, more generally, cited no legal authority in support of its justifiable-reliance argument. *Cf.* TEX. R. APP. P. 38.1(i) (requiring argument section of appellant's brief to contain "appropriate citations to authorities").

c.      a general partner in a partnership in which the Debtor is a general partner; or

d.      a relative of a general partner, director, officer, or person in control of the Debtor.

Answer "Yes" or "No" for each asset listed below.

1.      Plaintiff's initial payment to Sierra/Innova

Answer:      *Yes*

2.      Payments from the sale of the STC owned by Sierra/Innova

Answer:      *Yes*

### a.     *Initial Payment*

Innova argues that there was no evidence that it transferred $800,000 of GC System's initial payment of $1,036,426 with the intent to hinder, delay, or defraud GC System. Innova points to Arters's testimony that "much of it was returned within the next few weeks, and the entire amount was returned within 60 days."

GC System responds by arguing that even if the $800,000 were returned, "[n]othing within TUFTA suggests that returning a fraudulently transferred asset is a defense." GC System also emphasizes that it presented evidence on four badges of fraud, those being: (1) the transfer was to an insider; (2) the transfer was of substantially all of Sierra or Innova's assets; (3) Innova was insolvent or became insolvent shortly after the transfer was made; and (4) the transfer occurred shortly before or shortly after a substantial debt was incurred. *See* TEX. BUS. & COM. CODE ANN. § 24.005(b)(1), (5), (9), (10).

Innova's opening brief fails to challenge — even in a conclusory fashion — the sufficiency of the evidence supporting any of the badges of fraud on which the jury was charged. Indeed, our sister courts have held that "[t]he presence of several [badges of fraud] is sufficient to support a fact finder's reasonable inference of fraudulent intent." *Qui Phuoc Ho v. MacArthur Ranch, LLC*,

395 S.W.3d 325, 329 (Tex. App.—Dallas 2013, no pet.) (citing *Mladenka v. Mladenka*, 130 S.W.3d 397, 405 (Tex. App.—Houston [14th Dist.] 2004, no pet.)). GC System's uncontested reference to evidence supporting four of the badges of fraud dooms Innova's legal sufficiency challenge.

### b.    *STC Payment*

Innova acknowledges Arters's testimony that Innova transferred one STC to Huffstutler for $100,000, and that money was transferred to Gulf View to pay down an existing loan. Nevertheless, Innova argues that there was no evidence that this transfer was made with "actual intent to hinder, delay, or defraud" GC System as a "creditor." Innova references *Janvey v. Gage*, 856 F.3d 377, 385–86 (5th Cir. 2017), for its holding that rejected a receiver's contention that:

> there is direct evidence of fraud when a debtor uses Creditor A's money to pay off its debts to Creditor B *and* the debtor knows, or must know, that the natural consequence of its action is that Creditor A will be hindered, delayed, or defrauded in the collection of its debts.

*Id*. at 385 (internal quotation marks and citation omitted; emphasis in original). In *Janvey*, the jury declined to find that a transfer was fraudulent under TUFTA, and the receiver argued that "he provided the jury with irrefutable direct evidence of fraud." *Id*. The federal appellate court surveyed the evidence and found that there was sufficient evidence supporting the jury's decision to reject several distinct badges of fraud. *Id*. at 385–86.

As with the $800,000 transfer, GC System emphasizes that it presented at least four badges of fraud, those being: (1) the transfer of the STC was to an insider — Whitesell; (2) before the transfer was made, Sierra or Innova had been sued or threatened with suit — in this case, the STC sale occurred after the trial court signed the agreed order granting partial summary judgment establishing Innova's contractual liability; (3) the transfer was of substantially all of Sierra or

Innova's assets; and (4) the transfer occurred shortly before or shortly after a substantial debt was incurred. *See* TEX. BUS. & COM. CODE ANN. § 24.005(b)(1), (4), (5), (10).

As with Innova's argument regarding the initial payment, Innova's opening brief fails to challenge the sufficiency of the evidence supporting any of the badges of fraud on which the jury was charged. As we have already held, such evidence is sufficient to support a fact finder's reasonable inference of fraudulent intent. *See Qui Phuoc Ho*, 395 S.W.3d at 329. Moreover, we find Innova's reliance on *Janvey* misplaced. Discussing the holdings of our sister courts, the court in *Janvey* recognized, because "this intent . . . is seldom susceptible of direct proof, courts have relied on badges of fraud, eleven of which are listed in the statute, as circumstantial evidence of fraud." 856 F.3d at 385 (internal citation and quotation marks omitted). In rejecting the receiver's contention that he had conclusively established fraud, the *Janvey* court surveyed the evidence under the appropriate standard of review and concluded that sufficient evidence supported the jury's rejection of the receiver's position. *Id*. at 386. The court did not, as Innova suggests, articulate a bright line rule that "payment of an antecedent debt . . . does not itself establish fraud."

We overrule Innova's legal and factual sufficiency challenges to GC System's TUFTA claim.

### III. PIERCING THE CORPORATE VEIL

In the first corporate veil piercing question, the jury was asked and it answered:

Is Neil Whitesell responsible for the conduct of Sierra or Innova?

Neil Whitesell is "responsible" for the conduct of Sierra or Innova if:

> Sierra or Innova was organized and operated as a mere tool or business conduit of Neil Whitesell; there was such unity between Neil Whitesell and Sierra or Innova that the separateness of Siera or Innova had ceased; and Neil Whitesell caused Sierra or Innova to be used for the purpose of perpetrating and did perpetrate an actual fraud on Plaintiff primarily for the direct personal benefit of Neil Whitesell.

In deciding whether there was such unity between Sierra or Innova and Neil Whitesell that the separateness of Sierra or Innova had ceased, you are to consider the total dealings of Sierra or Innova and Neil Whitesell, including —

1.      the degree to which Sierra or Innova's property had been kept separate from that of Neil Whitesell;

2.      the amount of financial interest, ownership, and control Neil Whitesell maintained over Sierra or Innova; and

3.      whether Sierra or Innova had been used for personal purposes of Neil Whitesell.

OR

Neil Whitesell used Sierra or Innova for the purpose of perpetrating and did perpetrate an actual fraud on Plaintiff primarily for the direct personal benefit of Neil Whitesell.

OR

Neil Whitesell used Sierra or Innova as a means of evading an existing legal obligation for the purpose of perpetrating and did perpetrate an actual fraud on Plaintiff primarily for the direct personal benefit of Neil Whitesell.

OR

Neil Whitesell used Sierra or Innova to protect a crime or to justify a wrong for the purpose of perpetrating and did perpetrate an actual fraud on Plaintiff primarily for the direct personal benefit of Neil Whitesell.

Answer "Yes" or "No" for each of the following:

Sierra: *Yes*
Innova: *Yes*

The second corporate-veil-piercing question inquired the same as to "WII," which the jury charge

defined as "Defendant Whitesell International, Inc.[,] now known as Gulf View Private

Investment, Inc." The jury answered "Yes" for both Sierra and Innova.[23] No party disputes that

---

[23] The jury charge also asked whether Arters or Costantino were acting in the scope of their employment with Gulf View, and it answered "Yes" as to both individuals. Aside from challenging GC System's ability to recover from both the principal (Gulf View) and agents (Arters and Costantino), no party challenges these jury findings.

these two corporate veil piercing questions comport with Section 21.223 of the Texas Business Organizations Code. *See* TEX. BUS. ORG. CODE ANN. § 21.223.

## A.  Direct Personal Benefit

GC System argues that it presented four categories of evidence to satisfy the direct personal benefit element in section 21.223(b).[24]  First, GC System's downpayment of $1,036,368.51 allowed Whitesell to reduce his monthly loan "obligation" to Innova by $800,000 for the month GC System's deposit cleared.  Second, GC System posits that the March 2017 meeting culminated in GC System not requesting a $275,000 refund on the fuel system modification.  This concession, according to GC System, functioned as an interest-free loan to Innova — and by extension — relieved Whitesell from having to front $275,000 to Innova.  Third, "Whitesell kept Sierra underfunded by parsing out just enough money each month to keep Sierra developing STCs."  Fourth, Costantino, acting as Whitesell's agent, "fraudulently transferred to [a Whitesell-controlled business entity] the $100,000 generated from the sale of Sierra/Innova's most valuable asset: an STC."

Whitesell argues that GC System's four categories of evidence are legally insufficient to support the direct personal benefit element.  The Whitesell Appellants' opening brief references *Morgan v. Fuller*, No. 07-15-00314-CV, 2016 WL 2766106, at *2–3 (Tex. App.—Amarillo May 11, 2016, no pet.) (mem. op.), for the proposition that "evidence showing that fraudulently

---

[24] Section 21.223(b) provides:

> Subsection (a)(2) does not prevent or limit the liability of a holder, beneficial owner, subscriber, or affiliate if the obligee demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate.

TEX. BUS. ORG. CODE ANN. § 21.223(b).

procured funds were used to satisfy a corporation's financial obligations cuts against the notion that the fraud was perpetrated primarily for the direct personal benefit of an individual." In *Morgan*, the plaintiff asserted that the primarily-for-direct-personal-benefit requirement was met where the plaintiff's payment was procured by fraudulent means and used to pay company debts. *Id*. at *2. This benefited the individual defendant, the plaintiff argued, because the defendant's ownership interest in the company "retained its value" as long as the company paid its bills. *Id*. Our sister court rejected the plaintiff's argument, noting that "the monies paid by [the plaintiff] were not pocketed by or diverted to" the defendant. *Id*. Instead, the funds were used to satisfy corporate obligations. *Id*. The court held that this evidence "tend[s] to contradict the notion that the fraud . . . was perpetrated for the primary, direct benefit of" the defendant. *Id*. at *3.

In *TransPecos Banks v. Strobach*, 487 S.W.3d 722, 737 n.11 (Tex. App.—El Paso 2016, no pet.), also referenced in Whitesell's opening brief, the court held that payment of a relative's debt constituted no evidence of a direct personal benefit. In *TransPecos*, the court rejected a plaintiff-bank's contention that the defendant-borrower, the sole shareholder of a borrowing corporation, received a direct personal benefit by allegedly utilizing loan proceeds to pay off the defendant's father's personal debts. *Id*. at 724, 737 n.11. The plaintiff-bank acknowledged that the defendant-borrower had no personal liability for any of her father's debts. Therefore, the court held that the plaintiff's "actions could not have divested her of a liability that did not exist in the first place." *Id*. at 737 n.11.

The analysis of how debt affects the direct-personal-benefit element in *Morgan* and *TransPecos*[25] illuminates our analysis of Whitesell's loans because they may be categorized as the inverse of debt. Implicit in all of GC System's direct personal benefit arguments are the notions

---

[25] GC System's responsive brief makes no mention of *Morgan* or *TransPecos*.

that Whitesell was personally *obligated* to loan Innova an average of $1 million each month and the money Innova received from Whitesell is fungible and relieved him — at least temporarily — of his loan *obligations*. However, GC System directs us to no evidence supporting its notion that Whitesell was obligated to loan Innova an average of $1 million each month. The pattern that GC System highlights does not squarely suggest such an obligation and may equally support an inference that Whitesell was merely determined to see Innova turn a corner. *See United Rentals N. Am., Inc.*, 668 S.W.3d at 642. Accordingly, any monies that Whitesell saved by "underfunding" Innova constitute no evidence of a direct personal benefit. *See TransPecos*, 487 S.W.3d at 737 n.11; *Morgan*, 2016 WL 2766106, at *2–3.

Next, there is no evidence that Whitesell personally pocketed GC System's downpayment of $1,036,368.51, the $275,000 refund that GC System forwent, or the $100,000 generated from the STC sale. Neither *Morgan* nor *TransPecos* espouse GC System's implicit notion that all money is fungible, and we conclude that such an understanding is beyond the plain text of section 21.223(b). Accordingly, Whitesell is akin to the defendant in *Morgan*, 2016 WL 2766106, at *2, in that "the monies paid by [GC System] were not pocketed by or diverted to" Whitesell.

Assuming without deciding that sufficient evidence supports section 21.223(b)'s "actual fraud" requirement as submitted in both corporate veil piercing questions, we conclude that section 21.223(b)'s "primarily for the direct personal benefit" prong as submitted in both corporate veil piercing questions is not supported by legally sufficient evidence on this record.

## B.    Contract and Tort Liability

GC System argues that section 21.223 does not apply to torts. Therefore, according to GC System, it need only show that Whitesell and Innova are alter egos, and it is absolved from having to present evidence of Whitesell's direct personal benefit. Whitesell responds by arguing that section 21.223 applies to "any contractual obligation of the corporation *or any matter relating to*

*or arising from the obligation . . . .*" TEX. BUS. ORG. CODE ANN. § 21.223(a)(2) (emphasis added).

Whitesell further argues that GC System's tort claims fall well within the "any matter relating to

or arising from the obligation."

GC System fails to direct us to an objection at the charge conference to the charge, which

makes no distinction between contract and tort claims in terms of veil piercing.[26]  As we have

previously noted, "[o]ur review is restricted to the jury charge as submitted *when there was no*

*objection to the instruction*." *Seger*, 503 S.W.3d at 407 (emphasis added).  Therefore, GC System

was obligated to present legally sufficient evidence of Whitesell receiving a direct personal benefit

in accordance with section 21.223(b).  As noted above, GC System failed to do so.

We sustain the Whitesell Appellants' sole discrete issue.

### IV. DUPLICATIVE RECOVERY

**A.      One-Satisfaction Rule**

"Under the common-law one-satisfaction rule, a plaintiff is entitled to only one recovery

for any damages suffered."  *Bay, Ltd. v. Mulvey*, 686 S.W.3d 401, 406 (Tex. 2024) (citing *Sky*

*View at Las Palmas, LLC v. Mendez*, 555 S.W.3d 101, 106–07 (Tex. 2018)). "[T]he fundamental

consideration in applying the one-satisfaction rule is whether the plaintiff has suffered a single,

indivisible injury — not the causes of action the plaintiff asserts . . . ."  *Bay, Ltd.*, 686 S.W.3d at

406 (quoting *Sky View*, 555 S.W.3d at 107).

---

[26] At the charge conference, GC System objected on a choice of law theory, arguing:

> Your Honor, before defendants lodge their objections, plaintiff did submit a brief on choice of law for piercing the corporate veil.  Defendants have obviously filed their objection and response to that.
>
> This is currently drafted based on Texas law.  We would still like to reurge that it should be based on Delaware and Florida law which the only difference is that we don't need to show a direct personal benefit to pierce the corporate veil.

The trial court ruled that Texas law would apply.

Innova argues that GC System's injury is Innova's failure to timely deliver GC System's Aircraft with the satisfactorily completed MRO and modifications services. It argues that this overarching injury is satisfied by GC System's breach of contract claim and that it encompasses three smaller injuries, those being: (1) failure to prevent hail damage, preserve engines, or account for logbooks and engineer drawings; (2) reliance on Innova's alleged misrepresentations; and (3) loss of GC System's initial payment.

The final judgment awards out-of-pocket damages for GC System's breach of contract claim. This figure, as we have explained, necessarily incorporates MRO and modification services. Under GC System's TTLA claim, the jury awarded $584,171 for the Aircraft, $14,000 for the SkyStep cabin steps modification, $308,557 for the original avionics, and $150,000 for parts taken from the Aircraft and used on other aircraft. No one disputes that the Aircraft, the SkyStep cabin steps, and the original avionics were subject to the modification proposals that form the basis of GC System's breach of contract claim. Moreover, GC System's breach of contract claim centers, at least in part, on Innova's failure to perform modifications relating to the Aircraft, the SkyStep cabin steps, and original avionics. The same cannot be said of the parts taken from the Aircraft and used on other aircraft. Accordingly, GC System's TTLA claim as to the Aircraft, the SkyStep cabin steps, and the original avionics is barred by the one-satisfaction rule. Under the same principle, GC System's TTLA claim as to the other parts is not.

As for GC System's negligence claim, Innova argues:

> [GC System] could not have both contractual damages and a remedy for negligence because all the alleged acts of negligence arose within the contractual relationship between [GC System] and Sierra/Innova. To the extent Defendants had a *duty* to prevent hail damage, preserve engines, or account for log books and drawings, they did so by virtue of the parties' contractual agreement. There was no *independent injury*, and thus, the Final Judgment's award of damages for both negligence and breach of contract also violated the one-satisfaction rule.

. . .

> The jury was also asked to find liability for hail damage (a classic negligence issue), but [GC System]'s Radek Kindl conceded that the amount paid to repair hail damage was included in the amount paid to Lancair, which was submitted to the jury as an element of contract damage.[27]

The focus of our inquiry is whether there is a "single, indivisible injury." *Bay, Ltd.*, 686 S.W.3d at 406 (quoting *Sky View*, 555 S.W.3d at 107). While the MRO and modification services that GC System purchased from Sierra are why it entrusted possession of the Aircraft to Innova, the expenses relating to the hail damage, unpreserved engines, and lost logbooks and engineering drawings are not the same injury as Innova's failure to perform the MRO and modification services under the agreements.

> Nevertheless, on examination by Innova, Kindl testified:
>
> Q.  You also gave the jury an amount for repair of hail damage. Do you recall that?
>
> A.  Yes, I do.
>
> Q.  You will agree with me that that amount was included in the total amount paid by GC System to Lancair?
>
> A.  I do agree with you.

GC System emphasizes that Kindl testified at trial as its "corporate representative." The jury awarded all that GC System sought under its breach of contract claim, which according to Kindl's admission includes the cost to repair the hail damage. Accordingly, the hail damage awarded under GC System's negligence claim is barred by the one-satisfaction rule. Conversely, damages awarded for unpreserved engines and lost logbooks and engineering drawings are not barred by the one-satisfaction rule because Kindl's admission did not concern these damages and Innova

---

[27] Innova's argument regarding the interplay between Kindl's admission, GC System's negligence claim, and the jury's award for hail damage, is made within its economic loss-rule argument. Liberally construing GC System's briefing, it may be more properly analyzed under the one-satisfaction rule. Regardless, GC System makes no responsive argument regarding the impact of Kindl's admission on our analysis.

provides no additional record references to suggest that the one-satisfaction rule could apply to these damages.

## B.  Economic Loss Rule

"The economic loss rule generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy."  *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014).  The variant of the economic loss rule that we are asked to employ in the instant appeal encompass two concepts.  *See Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 415 (Tex. 2011) ("[T]here is not one economic loss rule broadly applicable throughout the field of torts, but rather several more limited rules that govern recovery of economic losses in selected areas of the law.") (quoting Vincent R. Johnson, *The Boundary–Line Function of the Economic Loss Rule*, 66 WASH. & LEE L. REV. 523, 534–535 (2009)).  First, in *Chapman Custom Homes*, the Texas Supreme Court held that "[h]aving undertaken to install a plumbing system in the house, the plumber assumed an implied duty not to flood or otherwise damage the trust's house while performing its contract with the builder."  445 S.W.3d at 718.  We refer to this rule as the "otherwise damage" construct.  Second, in *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 249–50 (Tex. 2014), the Texas Supreme Court elaborated that the economic loss rule barred negligence claims — and the delay damages sought pursuant to these claims — brought by subcontractors against an architecture firm for poorly drafted construction plans, drawings and specifications that resulted in delays.  We refer to this rule as the bar on damages resulting from delay.

Innova argues that GC System's negligence, negligent misrepresentation, and fraud claims are barred by the economic loss rule.  GC System responds by arguing that Innova's contention fails under the framework articulated in *Aircraft Holding Solutions., LLC v. Learjet, Inc.*, No. 3:18-

CV-0823-D, 2022 WL 562760, at *11 (N.D. Tex. Feb. 23, 2022), *aff'd*, No. 23-10388, 2024 WL 3042394 (5th Cir. Jun. 18, 2024) (per curiam) (not designated for publication). While not binding, we find *Aircraft Holding*'s framework to be instructive.

In *Aircraft Holding*, the owner of a private aircraft contracted with a maintenance shop for routine maintenance and inspections services. 2022 WL 562760, at *1. While the contracted-for maintenance work was being performed, the aircraft "fell off its maintenance jacks" and sustained "significant damage." *Id*. The owner asserted, among other things, claims for negligence against the shop. *Id*. at *4. The shop responded by seeking summary judgment on the owner's negligence claim on a contention that it was barred by the economic loss rule. *Id*. The federal district court observed that the owner's negligence claims were divided between those relating to the incident, which were governed by the contract, and those relating to the shop's post-incident conduct, which were not governed by the contract. *Id*. at *4–*7. The federal court characterized the owner's incident-based damages as seeking the "benefit of the bargain," and, referencing *Chapman Custom Homes*, it elaborated that "this measure of damages seeks to approximate the extent of the damage to the [a]ircraft as a whole, giving no consideration to the value or anticipated value of the bargained-for maintenance and inspection services." *Id*. at *6. The federal district court held that the economic loss rule barred the owner's tort claims against the shop based on the shop's post-incident repair conduct, but it did not bar the owner's incident-based claim for damages arising from the post-incident conduct of the shop. *Id*. at *7.

Returning to the instant case, the jury awarded GC System damages related to hail — addressed in our analysis above — related to the unpreserved engines, and related to lost parts, logbooks, manuals, and engineer drawings. *Chapman Custom Homes* explains the incident and post-incident dichotomy in *Aircraft Holding*, and under it, Innova had an implied duty not to "otherwise damage" the Aircraft while "performing its contract(s)." Accordingly, *Chapman*

*Custom Homes* dictates that the damage to the unpreserved engines, and lost parts, logbooks, manuals, and engineer drawings are not barred by the economic loss rule because they fall under the "otherwise damage" construct. *See Chapman Custom Homes*, 445 S.W.3d at 718.

The award of $345,357 on GC System's negligent misrepresentation claim and $523,000 on GC System's fraud claim is governed by the bar on damages resulting from delay. The relevant jury charge question and instruction on GC System's negligent misrepresentation claim provides:

> In answering this question, consider only the following category of damages:
>
> > a. The *economic loss*, if any, otherwise suffered in the past as a consequence of Plaintiffs justifiable reliance on the misrepresentation.
>
> What sum of money, if paid now in cash, would fairly and reasonably compensate Plaintiff for its damage, if any, that were proximately caused by Defendants' negligent misrepresentations.

(emphasis added). GC System contends that the negligent misrepresentation damages compensate it for the "crisis management" expenses that Sierra/Innova's conduct caused it to incur. However, GC System fails to explain how its "crisis management" damages exclusively fall within the "otherwise damage" exception in *Chapman Custom Homes*, *see id*., much less how they survive the bar to damages resulting from delay articulated in *LAN/STV*, 435 S.W.3d at 249–50. Indeed, as Innova emphasizes, the jury charge couched the negligent-misrepresentation damages as "economic loss." Likewise, GC System contends that the jury's award of damages on its fraud claim compensates it for the cost of renting another private aircraft. However, GC System fails to explain how such monetary relief escapes *LAN/STV's* bar on damages resulting from delay. Although withstanding Innova's sufficiency challenge, the award of $345,357 on GC System's negligent misrepresentation claim and $523,000 on GC System's fraud claim are barred by the economic loss rule.

We sustain in part and overrule in part Innova's second issue.[28]

## V. ATTORNEYS' FEES

The final judgment awards GC System attorneys' fees "[b]ased on the verdict of the jury." However, it does not delineate which of the three potential claims — breach of contract, TUFTA, or TTLA — form the basis for its award. In Innova's fourth issue, it argues, among other things, that as a limited liability company, GC System cannot recover attorney's fees on its breach of contract claim because "[a]t the time suit was filed in 2018, [section] 38.001 only allowed recovery of attorneys' fees from 'an individual or corporation.'" As support, Innova references our opinion in *8305 Broadway Inc. v. J & J Martindale Ventures, LLC*, No. 04-16-00447-CV, 2017 WL 2791322, at *5 (Tex. App.—San Antonio Jun. 28, 2017, no pet.) (mem. op.). In *8305 Broadway*, we observed that, "[b]ased on the plain meaning of the terms 'individual' and 'corporation,' our sister courts have held the plain language of section 38.001(a)(8) does not provide for an award of attorney's fees against limited liability companies."[29] *Id*. at *4. We then agreed "with the analysis of our sister courts and similarly h[e]ld [the appellant] was not entitled to recover attorney's fees against [the appellee] because it is a limited liability company." *Id*. at *5.

GC System does not directly respond to Innova's argument. Instead, it argues that the jury pierced the corporate veil, making the Whitesell Appellants liable for breach of contract damages. The Whitesell Appellants, being individuals, means, according to GC System, that Innova's

---

[28] In Innova's fourth issue, it complains that the trial court abused its discretion by overruling its hearsay objection to the testimony of Kindl. Innova argues that the admission of Kindl's testimony was harmful because "key aspects of Kindl's testimony — including his testimony regarding reliance on Sierra/Innova's representations, an essential element of fraud and negligent misrepresentation — were not based upon his personal knowledge." Innova does not contend that Kindl's testimony caused the rendition of an improper judgment as to any of GC System's other claims. Because of our disposition of GC System's fraud and negligent misrepresentation claims, we need not address Innova's fourth issue. *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

[29] "The current version of the statute, which took effect in 2021, permits recovery of attorneys' fees against a limited liability company." *Repsol Oil & Gas USA, LLC v. Matrix Petroleum, LLC*, No. 04-18-00411-CV, 2023 WL 8897012, at *46 n.56 (Tex. App.—San Antonio Dec. 27, 2023, pet. pending) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(a)).

reliance on our holding in *8305 Broadway* is misplaced. However, we have already sustained the Whitesell Appellants' legal sufficiency challenge to GC System's corporate veil piercing theory. Without an alternative argument, GC System has not responded to Innova's reliance on our holding in *8305 Broadway*. We conclude that our holding in *8305 Broadway* applies and that the final judgment could not have ordered Innova, as a limited liability company, to pay GC System's attorneys' fees under its breach of contract claim.

Innova also argues that if we reverse any portion of the actual damages awarded, then we should also reverse the award of attorneys' fees to GC System and remand for a new trial on attorneys' fees, if any. In *Horizon Health Corporation v. Acadia Healthcare Company, Inc.*, 520 S.W.3d 848, 883–84 (Tex. 2017), Horizon Health Corporation sued Acadia Healthcare Company for breach of contract and a violation of TLLA. The intermediate appellate court — and the Texas Supreme Court — held that legally insufficient evidence supported Horizon's breach of contract claim, leaving "Horizon's TTLA claim [a]s the only claim for which Horizon may recover an award of attorney's fees." *Id*. at 883. In crafting the appellate remedy as to the award of attorneys' fees, the Texas Supreme Court wrote:

> When Horizon's expert testified about Horizon's attorney's fees, he segregated the fees unrelated to Horizon's breach of contract and TTLA claims, but he did not specifically delineate the fees on a claim-by-claim basis. Thus, we have no way to know the amount of attorney's fees relating solely to the TTLA violations. In this instance, vacating the attorney's fees award and remanding for a new trial on the issue is proper. Further, a new trial will render moot Horizon's argument regarding the trial court's "sua sponte post-trial remittitur" of the attorney's fees award, so we need not address that issue. In short, we affirm the court of appeals' judgment reversing the attorney's fees award and remanding for a new trial on attorney's fees.

*Id*. at 884 (internal citations omitted).

In this case, as in *Horizon Health*, GC System's breach of contract claim cannot form the basis of an award of attorneys' fees. Additionally, we have both sustained and overruled Innova's sufficiency challenge to GC System's TTLA claim and, as detailed below, overruled Innova's

challenge to GC System's award of equitable relief. Accordingly, under *Horizon Health*, we will reverse the trial court's award of attorneys' fees and remand for a new trial on GC System's request for attorneys' fees.[30]

We sustain Innova's fourth issue.

## VI. JUDGMENT REFORMATION REQUESTS

In Innova's fifth issue, it argues that the judgment necessitates reformation in five aspects. GC System's third cross-issue also sounds in a reformation request. We address the two reformation requests that are necessary for the rendition of our appellate judgment. *See* TEX. R. APP. P. 43.3(a) ("When reversing a trial court's judgment, the court must render the judgment that the trial court should have rendered, except when a remand is necessary for further proceedings.").

## A. TUFTA & Equitable Relief

Section 24.008 of the Texas Business and Commerce Code, which is part of the TUFTA statute, provides in relevant part:

> (a) In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in Section 24.009 of this code, may obtain:
>
> . . .
>
> (3) *subject to applicable principles of equity* and in accordance with applicable rules of civil procedure:
>
>> (A) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;
>>
>> (B) appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or
>>
>> (C) any other relief the circumstances may require.

---

[30] In light of this holding, we need not address Innova's other arguments regarding the trial court's award of attorneys' fees, nor GC System's second cross-issue that the trial court abused its discretion in awarding it less than all of the attorneys' fees that it sought.

- 62 -

(b)     If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds.

TEX. BUS. & COM. CODE ANN. § 24.008 (emphasis added). Under a plain read reading of TUFTA, any equitable relief is "subject to applicable principles of equity."

The final judgment provides no monetary relief for GC System's TUFTA claim. Instead, it provides that "[a]s a result of transfers, GC System is entitled to an injunction against further disposition of Sierra/Innova's property and assets and the appointment of a receiver to take charge of the assets transferred or any other property of Sierra/Innova."

Appellants argue that the final judgment's award of monetary relief vitiates GC System's entitlement to equitable relief. They reference *Pike v. Texas EMC Mgmt., LLC*, 610 S.W.3d 763, 792 (Tex. 2020), for its holding that "[a] permanent injunction issues only if a party does not have an adequate legal remedy. If there is a legal remedy (normally monetary damages), then a party cannot get an injunction too." *Id.* (quoting *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 284 (Tex. 2004)).

GC System references our opinion in *Marin Real Estate Partners, L.P. v. Vogt*, 373 S.W.3d 57, 76 (Tex. App.—San Antonio 2011, no pet.) (internal citation omitted), for its pronouncement that "[a]s one court of appeals recognized, an award of permanent injunctive relief and past damages was not a double recovery because no future damages were awarded." GC System argues that the final judgment's award of monetary damages are for past damages whereas its provision of prospective injunctive relief is to prevent future conduct.

Our holding in *Marin*, 373 S.W.3d at 76, is rooted in the one-satisfaction rule. *Id.* (citations omitted) ("The prohibition against double recovery is a corollary to the one satisfaction rule, which provides that a plaintiff may recover only for the damages suffered as a result of a particular injury."). Indeed, even *Pike's* reference to "an adequate legal remedy" and a "legal remedy

(normally monetary damages)" suggests that a complaining party highlight the monetary relief that stands in the place of injunctive relief. *See Pike*, 610 S.W.3d at 792. However, appellants do not specify how a particular monetary award — or some combination — redresses the "particular injury," if any, that coincides with the injury allegedly redressed by the injunctive relief that is premised on GC System's TUFTA claim. Accordingly, appellants' contention fails.

We overrule the part of appellants' fifth issue relating to the final judgment's award of injunctive relief on GC System's TUFTA claim.[31]

## B. Post-Judgment Interest Rate

In GC System's third cross-issue, it complains that the final judgment fixes the post-judgment interest at 5%, but that it should be fixed at 7%. Innova and the Whitesell Appellants counter that the correct post-judgment interest rate is 6.25%.

Section 304.003 of the Texas Finance Code provides:

(a)    A money judgment of a court of this state to which Section 304.002 does not apply, including court costs awarded in the judgment and prejudgment interest, if any, earns postjudgment interest at the rate determined under this section.

(b)    On the 15th day of each month, the consumer credit commissioner shall determine the postjudgment interest rate to be applied to a money judgment rendered *during the succeeding calendar month*.

(c)    The postjudgment interest rate is:

(1)    the prime rate as published by the Board of Governors of the Federal Reserve System on the date of computation;

(2)    five percent a year if the prime rate as published by the Board of Governors of the Federal Reserve System described by Subdivision (1) is less than five percent; or

---

[31] In Sierra and Innova's reply brief, they argue that "[a]nd although TUFTA does provide equitable remedies to creditors, [GC System] did not move for an injunction or receivership or attempt to show that it was entitled to either form of equitable relief. [Therefore,] *Schneider* and *Marin* are [] inapposite." We respectfully decline to address this new argument. *See Lopez v. Montemayor*, 131 S.W.3d 54, 61 (Tex. App.—San Antonio 2003, pet. denied) ("A reply brief is not intended to allow an appellant to raise new issues."). Even if presented in their opening brief, there is no indication that it was presented below. *See* TEX. R. APP. P. 33.1.

(3)     15 percent a year if the prime rate as published by the Board of Governors of the Federal Reserve System described by Subdivision (1) is more than 15 percent.

TEX. FIN. CODE ANN. § 304.003 (emphasis added).  The final judgment in this case was signed on November 7, 2022.  On October 18, 2022, the consumer credit commissioner published a "Texas Credit Letter" that fixes a "Judgment Rate – Sec. 304.003, TEX. FIN. CODE" for an "effective period" of "11/01/22-11/30/22" at 6.25%.  November is the "succeeding calendar month" to October.

We overrule GC System's third cross issue, sustain the part of appellants' fifth issue relating to post-judgment interest, and modify the final judgment's award of post-judgment interest from 5% to 6.25% and delete the provision providing "or the prime rate, whichever is higher."  *See* TEX. FIN. CODE ANN. § 304.007 ("A court of this state shall take judicial notice of a published postjudgment interest rate."); *see also Williams v. Barnett*, No. 01-10-00526-CV, 2011 WL 2436500, at *5 (Tex. App.—Houston [1st Dist.] Jun. 16, 2011, pet. denied) (mem. op.) ("To change the interest rate in the judgment after the limited remand would be to retroactively alter the original judgment when the trial court had no authority to do so.").

## C.     Other Reformation Requests

Innova also requests that we reform the judgment to (1) articulate how each defendant is liable as to each claim; (2) correct scrivener's errors in the apportionment of TTLA liability among the defendants; and (3) aggregately award pre-judgment interest against all defendants.

We cannot address Innova's reformation requests.  In *Heritage Housing Development, Inc. v. Carr*, 199 S.W.3d 560, 562–63 (Tex. App.—Houston [1st Dist.] 2006, no pet.), a claimant sued a nursing home, its parent corporation, and several healthcare providers.  The nursing home and its parent corporation appealed.  *Id.* at 563.  The First Court of Appeals held that the evidence was legally insufficient to support the claims against the parent corporation.  *Id.*  It also held the

evidence was legally sufficient to support the claims against the nursing home. *Id*. Our sister court observed that it could not "be reasonably certain that the inclusion of [the parent corporation] in the charge did not affect the jury's findings as to damages and the apportionment of liability with respect to [the nursing home.]" *Id*. at 572. It, therefore, remanded the case for a new trial as to the nursing home. *Id*. Our rendition of a take nothing judgment in the Whitesell Appellants' favor presents similar considerations. Accordingly, Innova's reformation requests, if they persist, may be addressed by the trial court after a new trial. *See id*.; *see also Diamond Offshore Drilling, Inc. v. Black*, 652 S.W.3d 463, 483 (Tex. App.—Houston [14th Dist.] 2022, no pet.).

## VII. REMAND

There is legally insufficient evidence supporting all of the jury's awards of $150,000 for removed parts on GC System's TTLA claim and $200,000 for lost parts on GC System's negligence claim. In the first instance, GC System stipulates that it would accept a remittitur. In certain situations, we may suggest a remittitur for discrete awards. *See Wal-Mart Stores, Inc. v. Nicholson*, No. 04-97-00052-CV, 1998 WL 224744, at *2 (Tex. App.—San Antonio May 6, 1998, pet. denied) (mem. op.) ("If the evidence is factually insufficient to support part of a damage award, then the court should suggest a remittitur."). However, our appellate remedies are also governed by Texas Rule of Appellate Procedure 44.1(b), which provides:

> If the error affects part of, but not all, the matter in controversy and that part is separable without unfairness to the parties, the judgment must be reversed and a new trial ordered only as to the part affected by the error. *The court may not order a separate trial solely on unliquidated damages if liability is contested.*

TEX. R. APP. P. 44.1(b) (emphasis added).

The jury apportioned liability on GC System's TTLA and negligence claims as between some or all of the Whitesell Appellants, Sierra, and Innova. The Whitesell Appellants have prevailed on their legal sufficiency challenges to GC System's theories of direct and vicarious

liability, and the Whitesell Appellants are entitled to a take nothing judgment in their favor. In the current posture, we are in no position to determine the apportionment of liability as between Sierra and Innova. Moreover, while questions on the apportionment of liability rest between liability and damage questions, they nevertheless may affect the amount of damages that a defendant may have to pay. For example, our proportionate liability statute provides:

> Except as provided in Subsection (b), a liable defendant is liable to a claimant only for the percentage of the damages found by the trier of fact equal to that defendant's percentage of responsibility with respect to the personal injury, property damage, death, or other harm for which the damages are allowed.

TEX. CIV. PRAC. & REM. CODE ANN. § 33.013(a).

Rule 44.1(b) compels us to remand the liability, apportionment, and damage questions relating to GC System's (1) TTLA claim with regard to the removed parts; and (2) negligence claim with regard to lost items. We must also remand the liability and apportionment questions relating to GC System's negligence claim with regard to engine damage.[32]

## VIII. CONCLUSION

In chart form, the trial court's judgment, the appellate remedies that we have applied, and our appellate judgment provide:

---

[32] Regardless of their unsuccessful legal and factual sufficiency challenge regarding the standard of care and causation elements on GC System's negligence claim relating to engine damage, appellants have consistently stipulated that $464,000 is the correct corresponding damage award. Innova and Sierra have presented no argument for why their stipulation would not continue to bind them upon remand.

| Claim | Trial Court Judgment | Appellate Remedy | | | | Appellate Judgment |
|---|---|---|---|---|---|---|
| | | Affirmed | Barred as Duplicative | Compels Remand | Rendered | |
| Breach of Contract - Out of Pocket Damages | $1,036,426 | $1,036,428 | | | | $1,036,428 |
| Breach of Contract - Mitigation Damages | $0 | $0 | | | | $0 |
| TTLA | $1,053,728 | | | | | Remanded |
| SkyStep Cabin Steps | $14,000 | | $14,000 | | | |
| Original Avionics | $305,557 | | $305,557 | | | |
| Removed Parts | $150,000 | | | x | | |
| Aircraft | $584,171 | | $584,171 | | | |
| Negligence | $850,000 | | | | | Remanded |
| Lost Items | $200,000 | | | x | | |
| Hail Damage | $186,000 | | $186,000 | | | |
| Engine Damage | $464,000 | $464,000 | | | | |
| Negligent Misrepresentation | $345,387 | | $345,387 | | | $0 |
| Fraud | $750,000 | | $750,000 | | | $0 |
| TUFTA | Injunction | | | | | Injunction |

We affirm (1) the take nothing judgment in favor of Sierra and Innova and against GC System on GC System's request for an award of mitigation damages; (2) the award of $464,000 for engine damage on GC System's negligence claim against Sierra and Innova; and (3) the award of injunctive relief in GC System's favor and against Sierra and Innova on GC System's TUFTA claim.

We modify, and affirm as modified, the trial court's judgment so as to (1) reflect that GC System is awarded $1,036,428 in out-of-pocket damages from Innova and Sierra for their breach of contract; and (2) provide that the post-judgment interest rate is 6.25 percent and delete the provision providing "or the prime rate, whichever is higher."

We reverse and render a take nothing judgment in favor of Gulf View, Whitesell, Costantino, and Arters on all of the claims asserted by GC System. We further reverse and render a take nothing judgment in Sierra and Innova's favor and against GC System on GC System's (1) claim of negligent misrepresentation; (2) claim of fraud; (3) award of $14,000 for the SkyStep cabin steps, $305,557 for the original avionics, and $584,171 for the Aircraft in relation to its claim for violation of the TTLA; and (4) award of $186,000 in relation to its claim of negligence.

We reverse and remand for a new trial on (1) GC System's claim for violation of the TTLA, the only viable damage element being one for removed parts; (2) GC System's claim of negligence, which encompasses the stipulated amount of $464,000 for engine damage and the only viable damage element being one for lost items; and (3) GC System's request for an award of reasonable and necessary attorneys' fees from Sierra and Innova on GC System's claims for violations of the TTLA and the TUFTA.

Rebeca C. Martinez, Chief Justice